UNITED STATES of America,
Plaintiff–Appellee,

v.

Robert SIMMONS, Defendant–Appellant.

No. 89–3864.

United States Court of Appeals,
Fifth Circuit.

Nov. 19, 1990.

Ferdinand J. Kleppner, Law Offices of Ferdinand J. Kleppner, Metairie, La., for defendant-appellant.

Steven J. Irwin, Robert J. Boitmann, Asst. U.S. Attys., John P. Volz, U.S. Atty., New Orleans, La., for plaintiff-appellee.

Before CLARK, Chief Judge, THORNBERRY, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Robert Simmons and his co-defendant, Brent Roser, were each convicted of possession of cocaine with intent to distribute, and of conspiring to distribute cocaine. Drugs were discovered on the two men during warrantless searches conducted following an airport stop. Simmons appeals the district court's refusal to suppress this evidence, 724 F.Supp. 426 (E.D.La.1989); he also claims that the government's evi-

dence was insufficient to support his conspiracy conviction.

Because we conclude that Simmons was not unlawfully detained, and that the searching officer was armed with probable cause at the time of the search, we affirm Simmons's conviction for possession with intent to distribute. We also conclude that the government's proof of conspiracy was sufficient to support the guilty verdict; therefore, we affirm Simmons's conspiracy conviction as well.

## I.

On October 22, 1987, Simmons and Roser arrived at New Orleans International Airport on a flight originating in Los Angeles, California. Plainclothes narcotics officers with the Jefferson Parish Sheriff's Office, who were conducting a surveillance of the incoming flight, observed the two men as they disembarked the plane. The officers had no prior knowledge of Simmons and Roser, nor did they have any particular reason to be concerned with this flight, other than the fact that Los Angeles is considered a "source city" for narcotics traffic into New Orleans.

According to the arresting officers, Agents Gerald Simone and Glen Davis, their attention was drawn to the defendants because Roser was noticeably intoxicated as he exited the plane and proceeded up the concourse; and Simmons, appearing extremely nervous, was assisting him. At the top of the concourse, Agents Simone and Davis together approached the defendants, identified themselves as police officers, and asked the defendants if they could speak with them. The defendants apparently consented, and the four men stepped to one side of the concourse to avoid impeding the flow of travelers. Agent Simone then began questioning Roser, and Agent Davis likewise questioned Simmons. Roser told Simone that he was traveling from Los Angeles and that he had come to New Orleans in order to paint a house. However, when asked whose house he was planning to paint, Roser stated that he did not know.

At this point, the officers for the first time identified themselves as narcotics agents and sought permission from Roser to search his carry-on luggage. Roser consented. The officers found no contraband in Roser's luggage. However, they promptly noticed that Roser, without being asked to do so, had placed his hands above his head against the wall, with his feet widely spread apart. Understanding from this that Roser consented to being searched, Simone conducted a body search, finding a large plastic bag containing cocaine concealed in the inside pocket of Roser's sports jacket.

Seeing that Simone had discovered drugs in Roser's possession, Simmons became visibly apprehensive; he backed against the wall, zipped up his ski jacket, and crossed his arms tightly across his chest. Agent Davis, who had been standing beside Simmons, witnessed this reaction. Without Simmons's consent, Davis then patted down the outer garments of Simmons's clothing, detecting a bulge in Simmons's jacket. In a more extensive search Davis found that Simmons was carrying an identical package of cocaine in an inside pocket of his jacket.

Both defendants were then arrested and informed of their rights. They were charged with possession of cocaine with intent to distribute, 21 U.S.C. § 841(a)(2), and with conspiracy to distribute cocaine, 21 U.S.C. § 846. The district court denied defendants' motion to suppress. Defense counsel's motions for acquittal, at the close of the government's case-in-chief, and at the close of all evidence, were also denied. Simmons was sentenced to a term of thirty months imprisonment, plus three years active supervised release.

The version of the facts given by Simmons and Roser at trial differed substantially from the findings of the court. Both defendants claimed that they did not depart the aircraft together and that Simmons did not escort Roser up the concourse. They testified that they were approximately twenty-five to thirty feet apart when each was approached separately by a single officer who was later joined by three or four

other officers.[1] Both claimed that following their initial contact with the officers they felt constrained and unable to leave, but neither indicated that he felt threatened, coerced, or intimidated. Roser also testified that, in being questioned by Agent Simone, he explained that he came to New Orleans to paint his father's garage.

At trial the prosecution presented evidence indicating that Simmons and Roser were traveling together, that they were previously acquainted with one another, that they had recently discussed a trip to New Orleans, that they purchased their tickets for the flight on the same day (within one minute of each other) from the same location, and that they were assigned seats beside each other on the plane. Roser and Simmons acknowledged that they were acquainted but denied that they were traveling together or that they were even aware of each other's presence on the flight.[2]

## II.

Simmons's suppression argument had two resting points. First, Simmons insists that an unlawful seizure occurred the moment he was stopped; that the stop was intrusive of his liberty and privacy and that it could not possibly have been supported by reasonable suspicion as required by law. Second, Simmons contends that the involuntary search yielding the evidence was impermissibly conducted without a warrant or probable cause, contrary to the Fourth Amendment.

In denying Simmons's motion to suppress, the district court found that the initial encounter between the defendants and Agents Simone and Davis involved no coercion or detention and therefore was not a "seizure." The court concluded that Roser's conduct during the encounter evidenced his willing consent to both the search of his luggage and the body search that supplied the first tangible evidence of criminal conduct. According to the district court, Simmons's observed reaction to the discovery of drugs on Roser, combined with his visible apprehension as he exited the aircraft, was the basis for a reasonable suspicion that he, too, was engaged in criminal activity. Therefore, the officers were warranted in briefly detaining Simmons, and the pat-down search by Agent Davis was incident to a lawful detention. Finally, the court concluded that Davis, detecting what he might have thought was a weapon, was justified in removing the package of drugs Simmons had concealed in an inside pocket of his jacket. Alternatively, the court concluded that at the moment he felt the bulge in Simmons's jacket, Agent Davis had probable cause to believe Simmons was committing a crime.

■ In reviewing the district court's ruling on a motion to suppress based on testimony at a suppression hearing, we must accept the district court's factual findings unless they are clearly erroneous or are influenced by an incorrect view of the law. *United States v. Muniz–Melchor,* 894 F.2d 1430, 1433–34 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1957, 109 L.Ed.2d 319 (1990). We must also view the evidence in the light most favorable to the party that prevailed below. *United States v. Reed,* 882 F.2d 147, 149 (5th Cir.1989); *United States v. Langford,* 838 F.2d 1351 (5th Cir.1988).

Review of stops, interrogations, and searches at airports of suspected drug smugglers is unfortunately familiar judicial fare. In *United States v. Berry,* 670 F.2d 583, 591 (5th Cir.1982) (en banc), we found

---

**1.** The agents admitted that two additional undercover narcotics agents were nearby, but stated that neither identified himself to Roser or Simmons, nor did they assist Simone and Davis in questioning, searching, or arresting the defendants.

**2.** At trial the government called a special agent with the Drug Enforcement Administration to testify as an expert as to the packaging, distribution, and pricing of dangerous controlled substances. He testified that after analyzing the cocaine recovered from the defendants, it was his expert opinion that the packaging, quantity, and quality of the drugs indicated that they were intended for wholesale distribution, and not for retail sale or personal use. Further, he concluded from comparing the two parcels of drugs that they were in identical packages and were nearly identical in both weight and purity.

that in this as in other contexts there are three tiers of police-citizen encounters:

> [C]ommunication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief 'seizures' that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause.

The encounter between Simmons and his arresting officers at different times fell within each of these three categories.

■ Whether in the circumstances of a particular case the Fourth Amendment is invoked depends on the intrusiveness of the encounter as well as the strength of the government interest at stake. In *Berry* we held that not all airport stops need be classified as seizures;[3] a seizure has occurred only if " 'in view of all the circumstances surrounding the incident, a reasonable person would not have believed that he was free to leave.' " *Id.* at 595 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J., concurring)).

> [A]irport stops of individuals by police, if of extremely restricted scope and conducted in a completely non-coercive manner, do not invoke the Fourth Amendment. The interest of the government in terminating drug smuggling is, on the one hand, very substantial.... Considering on the other hand the intrusiveness on the individual, we believe that an airport stop need not necessarily be of so

coercive a nature that communication with police cannot be voluntary.... In an airport stop ... it is possible for a law enforcement officer not to interfere with an individual's progress in any way and to ascertain whether an individual is willing to cooperate with police before making further inquiries. Also, there need not be the display of official authority beyond a statement that the person stopping an individual is a law enforcement officer. That statement is not alone so coercive upon the mind of an individual that we must find that it transforms an encounter into a seizure.

*Id.* at 594–95.

■ The district court could have reasonably concluded that in their initial confrontation with Simmons and Roser, Agents Simone and Davis conducted themselves in such a manner as to avoid creating any impression of coercion. They calmly approached Simmons and Roser, identified themselves as law enforcement officers, and requested to speak with the two men. Though the defendants assert that they felt constrained to remain in the officers' presence, the district court found that the initial encounter involved no element of coercion or detention, and nothing in the record suggests otherwise. Our cases have clearly established that one's self-identification as a law enforcement officer is not so coercive that this statement alone renders an encounter between citizen and police a seizure. *United States v. Gon-*

---

**3.** In *Berry* the two defendants, Jessica Zabish and Dudley Berry, had just arrived in Atlanta, Georgia on a flight that had originated in Miami, Florida. 670 F.2d at 588. A DEA agent and a detective were watching passengers leave the flight and followed Berry because he looked familiar and appeared nervous. Outside the airport the agent approached Berry as he was carrying Zabish's luggage to the taxi stand where Zabish was waiting. The agent identified himself and began to question Berry about his identity and travel plans. Berry identified himself as David Sarver, but when asked for additional identification, he admitted his true identity. The agent recognized Berry's name as someone for whom he had been told to watch.

After Berry admitted that Zabish was traveling with him, the agent motioned to her to join them; at the same time, the detective walked over to Zabish, may have touched her elbow,

pointed toward the DEA agent and Berry, and asked her to join them. *Id.* at 588–89. The DEA agents then asked Berry and Zabish to accompany them to the DEA office. Once there, the defendants consented to a search, they were found to be in possession of cocaine, and they were arrested. *Id.* at 589.

The court found that the initial stop of Berry was not a seizure, at least until Berry admitted his real name. *Id.* at 603. At that point, the court found that the law enforcement officers had "reasonable suspicion" to detain Berry further. But the court found that Zabish was seized when the officers signalled to her to come over to them, and the detective "perhaps touched her elbow," because this appeared to be more of a command than a "request with which a reasonable person would believe he could freely comply or not." *Id.* at 604.

*zales,* 842 F.2d 748, 752 (5th Cir.1988), *overruled on other grounds, United States v. Hurtado,* 905 F.2d 74 (5th Cir. 1990). We also detect none of the circumstances that has in the past caused us to find that a reasonable person in the same situation would have believed that his freedom was being limited.[4] To the contrary, the district court's finding that initially Simmons was not seized is consistent with the decisions of this and other courts.[5]

■ After the encounter was initiated, the defendants voluntarily submitted to questioning by Agents Simone and Davis. It was then that the agents developed reasonable suspicion to justify detaining Roser and Simmons. The question of reasonable suspicion must be answered by looking objectively at the totality of the circumstances. Reasonable suspicion must be supported by specific and articulable facts which, taken together with rational inferences from those facts, would warrant a person of reasonable caution in the belief that the intrusion was appropriate. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968). Roser's explanation that he had come to paint a house, though which house he could not say, combined with his noticeable intoxication and Simmons's extreme nervousness when disembarking the plane, as well as

the fact that their flight was incoming from a known source city, all contributed to the agents' reasonable suspicion.

■ Having then developed a reasonable basis for suspecting that the defendants were engaged in unlawful activity, Agents Simone and Davis for the first time identified themselves as narcotics agents, and Simone promptly asked Roser if he could search his carry-on bag. At this point a seizure had occurred. The agents' conduct implicitly informed Roser and Simmons that they were suspected of smuggling drugs and that they would likely be detained absent explanation.

■ Simmons and Agent Davis looked on as Agent Simone searched Roser.[6] When Simmons saw that cocaine had been recovered from Roser's jacket, he became extremely nervous, he stepped back against the wall, he zipped up his ski jacket, and he crossed his arms tightly across his chest. Under these circumstances, Agent Davis, who witnessed the entire course of events, had probable cause to search Simmons. As the Supreme Court has stated, "Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief

4. *See, e.g., United States v. Robinson,* 625 F.2d 1211, 1216–17 (5th Cir.1980) (statements by officers that the individual is suspected of smuggling drugs); *United States v. Bowles,* 625 F.2d 526 (5th Cir.1980) (blocking an individual's path or otherwise intercepting or preventing their progress); *U.S. v. Elmore,* 595 F.2d 1036 (5th Cir.1979), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980) (retaining an individual's ticket for more than a minimal amount of time or taking the ticket over to a ticket counter).

5. *See, e.g., Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323–24, 75 L.Ed.2d 229 (1983) (noting that law enforcement officers would not violate the Fourth Amendment by stopping defendant in airport, identifying themselves as law enforcement officers, and asking him questions); *United States v. Galberth,* 846 F.2d 983, 989 (5th Cir.) (holding that defendant was not coerced by DEA agent who asked to speak with her, asked to see her airline ticket, and requested to see identification), *cert. denied,* 488 U.S. 865, 109 S.Ct. 167, 102 L.Ed.2d 137 (1988).

6. The district court concluded that Roser consented to the search of his bags and to the body search that produced the first tangible evidence against the defendants. A trial court's finding of consent will not be overturned unless clearly erroneous. *United States v. Tedford,* 875 F.2d 446, 451 (5th Cir.1989). Simmons argues that Roser did not *voluntarily* consent to be searched. The record shows no evidence of excessive coercion, however. The defendants were being detained; thus, to the extent that they attempted to leave, coercion was implicit. But a reasonable person would not have felt compelled to submit to a body search under these circumstances. The district court held that, aside from Roser's consent, the officers were justified in searching him given that they had probable cause to arrest Roser under Louisiana law for disturbing the peace. Because we find no evidence controverting Roser's consent to be searched, we do not reach this ruling.

that' an offense has been or is being committed [by the person to be arrested]." *Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979) (brackets in original) (quoting *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925))). The probable cause standard requires "not merely a reasonable suspicion that a crime has been committed, but a reasonable basis under the circumstances for reaching that conclusion and for acting on it." *Bigford v. Taylor*, 834 F.2d 1213 (5th Cir.), *reh'g denied*, 856 F.2d 191, *cert. denied*, 488 U.S. 822, 109 S.Ct. 66, 102 L.Ed.2d 43, 488 U.S. 851, 109 S.Ct. 135, 102 L.Ed.2d 108 (1988).

In finding that Agent Davis had probable cause to search Simmons, we depart from the findings of the district court. The district court held that Simmons's reaction to the discovery of drugs on Roser was enough to warrant only a reasonable suspicion that Simmons was engaged in criminal activity. According to the district court, Davis's reasonable suspicion justified a pat-down search of Simmons's outer garments; and when Davis detected something inside Simmons's jacket, because he could have reasonably believed it to be a weapon, fearing his safety, he was justified in performing a protective search. That conclusion supplied the only situation in which Davis could have justifiably subjected Simmons to a body search—that he reasonably believed "that he [was] dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883; *see also Unit-* *ed States v. Hammack*, 604 F.2d 437, 439–40 (5th Cir.1979) ("a stop must be based on a reasonable suspicion of criminal activity and the frisk must be supported by reasonable fear for the safety of the officer or others").[7] We doubt that Agent Davis reasonably believed that Simmons was armed and dangerous.[8] There is nothing in the record, no statement by Davis or Simone, which supports this factual assertion. In fact, the government's brief argues that when Davis patted down the outer garments of Simmons's clothing he discovered an object "which he believed to be narcotics." However, as we view this case, it was not necessary that Davis reasonably believed there was a need for a protective search. Based on Simmons's conduct upon seeing that Agent Simone had discovered drugs on Roser, and given the totality of the circumstances, the search was supported by probable cause.

The fact that Simmons was nervous was not in itself a basis for probable cause,[9] but there was more evidence of criminal activity. Simmons was accompanying a man who was found to be carrying drugs; and when Simone found the drugs on Roser, Simmons backed up against the wall, zipped up his jacket, and folded his arms tightly across his chest. Similar facts have supported probable cause.

In *United States v. Garcia*, 848 F.2d 58, 59 (4th Cir.), *cert. denied*, 488 U.S. 957, 109 S.Ct. 395, 102 L.Ed.2d 384 (1988), the defendant, Jorge Manual Garcia, and another man, Carlos Salas, arrived together at Washington National Airport from Miami, Florida, a known source city. DEA agents

---

**7.** We note that there are other situations, not relevant to this case, in which we have held that a strip search or body search can be justified on less than probable cause. For instance, customs officials can search a passenger who arrives at a domestic airport from a foreign country if they have a reasonable suspicion that the passenger is in possession of narcotics. *See United States v. De Gutierrez*, 667 F.2d 16, 19 (5th Cir.1982); *United States v. Himmelwright*, 551 F.2d 991, 994–95 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977); *United States v. Forbicetta*, 484 F.2d 645, 646 (5th Cir.1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974).

**8.** In the Minute Entry denying Simmons's motion to suppress, the district court stated that "it was not inconceivable to think that the package was a weapon."

**9.** *See Royer*, 460 U.S. at 507, 103 S.Ct. at 1329; *see also United States v. Place*, 660 F.2d 44, 49 (2d Cir.1981) ("Nervous behavior, traveling from a so-called 'source city,' minor errors on baggage tag, telling an undercover officer that his identity as such was recognized by the suspect, ... may be abnormal, but by themselves they are clearly not enough to constitute probable cause"), *aff'd on other grounds*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983).

were watching passengers leave this flight and noticed that Salas fit the profile of a drug courier. While Salas was in line waiting for a taxi, the agents approached him and asked if Garcia was with him. Salas said he was. After questioning both men, the agents received permission to search Salas's bag, in which they discovered a large quantity of cocaine. The agents then arrested both men, and the Fourth Circuit held that they had probable cause to do so. *Id.* at 61. For Garcia, it was sufficient that he was accompanying someone who was concealing a large quantity of cocaine.

> Had the officers not found a sufficient quantity of cocaine to indicate that Salas was engaged in distribution, defendant could more readily assert that many people innocently travel with other individuals possessing personal-use cocaine without even knowing it and that the discovery of such contraband should not establish probable cause to arrest the person who accompanied the one on whom the drugs are found. But where, as here, the quantity of cocaine is sufficiently large to indicate an intent to distribute, and where the two men are together and engaged in suspicious conduct indicating that they did not wish to be seen together, we conclude that there was probable cause to arrest the defendant.

*Id.*

As in *Garcia,* Simmons and Roser were traveling from a source city and the quantity of cocaine found on Roser was too large to be for personal use. These facts, coupled with Simmons's nervousness and his revealing reaction on seeing Simone find drugs on Roser, were enough to generate probable cause. This holding is consistent with *Garcia,* and with decisions of other federal circuit courts.[10]

### III.

    Simmons also contends that the district court erred in denying his motions for acquittal on the conspiracy charge; he argues that the evidence at trial was insufficient to establish the existence of a criminal conspiracy to distribute cocaine. Our standard of review of the sufficiency of evidence in support of a criminal conviction is whether, viewing the case in the light most favorable to the government, a rational trier of fact could have found from the evidence and inferences drawn therefrom that the defendant was guilty beyond a reasonable doubt. *United States v. Matt,* 838 F.2d 1356, 1358 (5th Cir.), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2020, 100 L.Ed.2d 607 (1988). Because we conclude that the government's evidence was sufficient to establish each element of the charge of conspiracy, we affirm Simmons's conviction on this count. We, of course, review the sufficiency of all the evidence rather than the evidence when the defendant moved for judgment of acquittal. *See United States v. Evans,* 572 F.2d 455, 479 (5th Cir.1978).

    To establish a conspiracy under 21 U.S.C. § 846, the government must

---

**10.** In each of the following cases, the courts have held that law enforcement officers monitoring airline passengers had probable cause to search a deplaning suspect: *United States v. Bowman,* 907 F.2d 63, 65 (8th Cir.1990) (defendant had arrived with another man to claim previously unclaimed suitcase containing cocaine); *United States v. Jaramillo,* 891 F.2d 620 (7th Cir.1989) (suspects had arrived on a flight from a source city, had purchased their tickets in cash on the same day of the flight with an open return date, carried little luggage, had taken a suspicious path through the concourse, and had left the escalator line after becoming aware of the agents), *cert. denied,* — U.S. —, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990); *United States v. Tomaszewski,* 833 F.2d 1532 (11th Cir. 1987) (defendant had arrived from a source city and had suspicious pie-shaped bulge in his pants); *United States v. Mancini,* 802 F.2d 1326 (11th Cir.1986) (defendant had no checked luggage, purchased his ticket with cash, was extremely nervous, and implicitly admitted he was carrying narcotics); *United States v. Lehmann,* 798 F.2d 692 (4th Cir.1986) (agent noticed package beneath defendant's pants that defendant was attempting to conceal); *United States v. Cipriano,* 765 F.2d 610 (7th Cir.1985) (defendant was accompanying owner of luggage containing cocaine, took temporary custody of luggage, and then tried to disassociate himself from it); *United States v. Cordell,* 723 F.2d 1283 (7th Cir.1983) (police officers knew that defendant had arrived from a source city, knew the name on his airline ticket did not match the name on his driver's license, and observed defendant become very nervous as officers questioned him), *cert. denied,* 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984).

prove "that a conspiracy existed, that each co-defendant knew of the conspiracy, and that each co-defendant voluntarily joined in it." *United States v. Molinar–Apocada,* 889 F.2d 1417, 1423 (5th Cir.1989). The government need not prove the existence of a formal agreement but must show beyond a reasonable doubt: "That two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan." *United States v. Williams–Hendricks,* 805 F.2d 496, 502 (5th Cir.), *reh'g denied,* 808 F.2d 56 (1986). The conspiracy need not be proved by direct evidence, but may be inferred from concert of action. *United States v. Magee,* 821 F.2d 234 (5th Cir.1987). While mere presence together at the scene of a crime or close association will not alone support the inference of a conspiracy, both are factors that the jury may rely on, together with the other evidence, in finding that a conspiracy existed. *United States v. Natel,* 812 F.2d 937, 940–41 (5th Cir.1987).

There was trial evidence that the defendants knew each other, that they exited the plane together, and that they were found to be carrying nearly identical packages of cocaine, both in quantities and qualities inconsistent with personal use. Though the government produced no direct evidence that Roser and Simmons mutually agreed to violate federal narcotics laws, the fact that the packages of cocaine both men were found to be carrying were virtually identical supports an inference that the drugs were purchased from the same source. When added to the other circumstances of this case, this is enough to infer the requisite concert.

### IV.

We conclude that the district court was correct in denying the motion to suppress, and that the government's evidence of conspiracy was sufficient to support the guilty verdict.

AFFIRMED.