**UNITED STATES of America**

v.

**Thomas HARLAN.**

**Crim. A. No. 93–69.**

United States District Court,
E.D. Louisiana.

June 4, 1993.

Spencer B. Eig, New Orleans, LA, for the U.S.

Ralph Capitelli, New Orleans, LA, for Harlan.

### ORDER AND REASONS

FELDMAN, District Judge.

The defendant moves to suppress the cocaine seized from him by two law enforcement officers at an airport encounter on the ground that it was obtained as a result of an unlawful search without probable cause or a valid warrant.

*Background*

On November 1, 1991, Thomas Harlan arrived at the New Orleans International Airport on American Airlines flight number 616 from San Antonio, Texas. Mr. Harlan had checked no luggage, had purchased a one-way ticket to New Orleans with cash, and was carrying a garment bag. These facts were communicated by a narcotics agent, Hughes, assigned to the Dallas airport to Sergeant Glenn Davis of the Jefferson Parish Sheriff's Office prior to Mr. Harlan's arrival. The narcotics agent in Dallas had noticed Harlan seemed especially nervous and when he ran a computer check on him, he discovered that Harlan was under investigation for trafficking in cocaine. The agent in Dallas gave Sgt. Davis a detailed description of

Harlan as well as his assigned seat number on the flight. Operating on the information provided by the Dallas narcotics agent, Sgt. Davis and Sgt. Gerard Simone then proceeded to the New Orleans airport to await the arrival of the flight.

According to the two policemen, one of whom was in plain clothes (Simone) and the other in uniform (Davis), Mr. Harlan deplaned and began walking very quickly down the concourse towards the lobby; he appeared to be nervously looking over his shoulder to see if he was being followed. Upon reaching the lobby, the defendant went quickly to a vehicle outside, a Jeep Cherokee. The vehicle was being driven by his fianceé, Denise Bartholomew. She started the engine even before he got to the car.

At this point, the defendant was approached by Sgt. Simone, who was not in uniform. According to the government, Sgt. Simone approached the suspect alone; Sgt. Davis had remained behind, because he was in uniform and did not want to attract Harlan's attention. Simone identified himself as a police officer and requested permission to speak with the defendant. Harlan agreed. Sgt. Simone inquired about where the defendant was coming from, asked to see the plane ticket, and then returned it to the defendant after inspecting it. The officer also inspected and returned the defendant's driver's license. During this encounter, the defendant's breath was labored and he appeared very nervous.

The defendant tells a different story. He says that the two officers approached him together, identified themselves as narcotics officers and immediately began questioning the defendant, demanding to see both his driver's license and his airplane ticket; he says they grabbed his arm; he insists they kept his documents during the entire three hour encounter with him. (But since the defendant eventually refused to consent to a personal search, it seems unusual that he would not have asked for a return of his property too, if he is to be believed. And since New Orleans was his destination, the police would have gained no advantage by keeping his airplane ticket).

Both sides agree that the officers requested and received permission to search the defendant's black garment bag. The officers discovered an earlier plane ticket to San Antonio and about $8,000 in cash in an envelope. During this search, Sgt. Davis asked about the defendant's trip to San Antonio, to which Harlan said that it was a pleasure trip to visit friends for three to four days. But the ticket indicated he'd only been there for some two days. As for the large amount of cash, the defendant stated that it was money he had received in a business venture. When the officers asked more questions, the defendant claimed that he had sold some horses while he was in Texas. But as the defendant was being questioned about the cash, the officers noted he got increasingly nervous, even stating at one point that the money could be considered illegal.

During this curbside conversation, Sgt. Davis noticed a large bulge inside the left pocket of the brown leather jacket the defendant was wearing. Davis asked Harlan if he would consent to a search of his person but Harlan refused, saying he would prefer that they get a search warrant (a point Harlan disputes). He was not told he could leave, but he was not restrained in any way, except he was eventually denied access to the bathroom once in the office to which he was escorted.

The officers admit when Harlan refused a personal search they told him to accompany them to the narcotics office located in the airport while they got a search warrant. The officers then say they returned the money and garment bag to the defendant, who stated while walking with the officers that he "never expected to see you guys out here today." (That day was a religious holiday.) The money was counted in the office. After about a two hour delay, Sgt. Davis returned with the search warrant. The door to the office was open at all times.

The defendant disputes the officers' account. He insists that Sgt. Simone took the defendant's right arm while Sgt. Davis carried the defendant's garment bag. The defendant says he was placed in a closed office and waited for two and a half hours for Sgt. Davis to return to the office with the search warrant. During this period, the defendant urges he did not feel that he was free to go.

Mr. Harlan also claims the officers physically stopped him at the car and started questioning him and told him he was under arrest (this seems inconsistent with his admission that he let them search his garment bag).

It is undisputed that once the search warrant was obtained and a personal search was conducted the officers recovered two ziplock plastic bags that contained eight ounces of cocaine.

The law regarding airport stops is rather clear. On the other hand, these cases are characteristically fact-unique and the Court must make credibility choices as one wades through applicable doctrine.[1]

### Law and Application

This case involves a police-citizen encounter in an airport resulting from a reasonable suspicion that the defendant was a drug courier. At issue is whether the police exceeded the limits of detention permitted by their reasonable suspicion, and seized the defendant without probable cause in an affront to the Fourth Amendment.

Beginning with the Supreme Court's well-known decision in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the scope of permissible police-citizen encounters has been a frequent topic in federal courts.[2] Two competing values seek our attention in regulating these encounters. On the one hand, courts ought not "inhibit voluntary interaction between police and citizens [as it] 'is no part of the policy underlying the Fourth Amendment to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.'" *United States v. Berry,* 670 F.2d 583, 590 (5 Cir. 1982) (*en banc*), quoting, *Collidge v. New Hampshire,* 403 U.S. 443, 488, 91 S.Ct. 2022, 2049, 29 L.Ed.2d 564 (1971). After all, there exists a "common interest of police and citizens in safety and effective law enforce-

ment." *Id.* at 591. Consequently, police officers

do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting the questions to him if he is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

*Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). These thoughts are clearly confirmed and supported at least to the point of completion of the search of Harlan's garment bag during the curbside incident.

At the same time, the Fourth Amendment's requirement that "searches and seizures be founded upon an objective justification, governs all seizures of the person, 'including seizures that involve only a brief detention short of traditional arrest.'" *United States v. Mendenhall,* 446 U.S. 544, 551, 100 S.Ct. 1870, 1875, 64 L.Ed.2d 497 (1980) (citations omitted). A person is seized "when, by means of physical force or a show of authority, his freedom of movement is restrained." *Id.* at 553, 100 S.Ct. at 1877. The purpose, then, of the Fourth Amendment is "not to eliminate all contact between the police and the citizenry but 'to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals.'" *Id.* at 554, 100 S.Ct. at 1877, quoting, *United States v. Martinez–Fuerte,* 428 U.S. 543, 554, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976).

If the detention can be said in law to be a seizure, the government must then show that probable cause existed for what occurred and what was discovered thereafter. Probable cause exists if the facts and circumstances within the officer's knowledge and of

---

1. In a case upon which the defendant heavily relies, the Supreme Court cautions us:

    Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers....

    *Florida v. Royer,* 460 U.S. 491, 506–08, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983).

2. In *Terry,* the Supreme Court held that a brief detention based upon reasonable suspicion of criminal activity does not offend the Fourth Amendment. 392 U.S. at 20–22, 88 S.Ct. at 1879–80. The rationale was later extended to stops for investigatory purposes. *See Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); *United States v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

which he had trustworthy information are sufficient to warrant in a person of reasonable caution the belief that an offense has been or is being committed by the person to be arrested. *United States v. Simmons,* 918 F.2d 476 (5 Cir.1990). The issue this motion presents is whether the police, by their conduct, had seized the defendant, and, if so, did they have probable cause to do so?

With these competing values in mind, the Fifth Circuit has described three levels of police-citizen encounters:

> [C]ommunication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief 'seizures' that must be supported by reasonable suspicion, and full scale arrest that must be supported by probable cause.

*United States v. Simmons,* 918 F.2d 476, 480 (5 Cir.1990), quoting *United States v. Berry,* 670 F.2d at 591.[3] The Fifth Circuit has determined that "airport stops of individuals by police, if of extremely restricted scope and conducted in a completely non-coercive manner, do not invoke the Fourth Amendment." *Berry,* 670 F.2d at 594. An airport stop is not a seizure unless "[in] view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Berry,* 670 F.2d at 595, quoting, *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. The *Berry* court expressed particular concern that the airport environment can be an intimidating one:

> The nervousness that air flight often engenders, the need quickly to make connections for continuing one's journey, the mere surprise from being accosted in a crowded airport concourse by a law enforcement officer for no apparent reason, and the pressure to cooperate with police to avoid an untoward scene before crowds of people, all make it easy for implicit threats or subtle pressure on an individual to acquiesce to the officer's wishes. In

such a situation it would be easy to misinterpret acquiescence to an officer's demands as consent; acquiescence cannot substitute for consent. (citations omitted).

*Id.* at 596. Consequently, this Court must, "in looking at the totality of circumstances of an airport stop ... closely scrutinize whether those circumstances reveal the presence of any coercion." *Id.* at 597. If such an examination equates with coercion, this Court "must hold that a reasonable person would believe his freedom had been limited." *Id.* That there might be evidence of consent is, moreover, not necessarily conclusive. The Fifth Circuit directs that the

> more intrusive on an individual's freedom complying with a request would be, the greater should be the skepticism with which a court treats assertions that an individual consented to a request. A court, therefore, should analyze with care evidence of consent to a search or a request to accompany an agent to an office.

*Id.*[4] With these skeptical warnings in mind, the Court turns to the facts of this case and the credibility choices that have to be made.

■ At what point, if ever, did the officers' actions, which began with a permissible *Terry*-type stop, rise to the level of a formal seizure? The defendant maintains that he was, in fact, effectively seized. First, the defendant argues that the permissible *Terry*-type stop of the defendant was quickly transformed into a seizure when the officers confiscated his driver's license and plane ticket. In *Florida v. Royer,* the Supreme Court found that a seizure occurred under facts the defendant argues are similar to those claimed to have occurred here:

> [A]sking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotic agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's licenses

---

3. The "brief 'seizures' that must be supported by reasonable suspicion" refers to what is commonly termed a *Terry*-type stop.

4. At the same time, there is no question that a suspect can freely and voluntarily consent to a search in the course of an airport stop. *See*

*United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (Suspects held to have consented to search after being told that they could decline the search and where there was no attempt by officers to retain possession of luggage, identification or plane tickets).

and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

460 U.S. at 501–02, 103 S.Ct. at 1326. If the defendant's version of the facts is to be believed, this case is superficially close. But one must observe that *Royer* announces no majority view. Only a plurality of the Court. And, contrary to *Royer*, Harlan's seizure did not take place until after he consented to a search of his garment bag, the cash was found, the story about his length of stay in San Antonio was suspect, and the large bulge was observed. In *Royer*, the suitcases were searched without consent, and the police admitted they did not have probable cause. *Royer* supports that Harlan was seized, but not that the circumstances of his seizure were without probable cause.

In short, if the seizure occurred after the pocket bulge was observed, what the officers did was, after all, not unreasonable (the textual test of the Fourth Amendment) under the circumstances; if the seizure occurred by virtue of the refusal of the officers to return Mr. Harlan's ticket and license as he claims, and before the garment bag was opened, then the officers may have had reasonable suspicion to act but not yet the needed probable cause. Can Harlan's account be taken as plausible? No. His destination was to New Orleans; no purpose would be served or advantage gained by keeping his plane ticket. His girlfriend was driving; one could hardly feel limited in movement with a friend about to drive him away. No one disputes he consented to the search of the garment bag, the presence of the cash, or the bulge. One would be hard pressed to characterize these pivotal facts, which are not in dispute, as falling short of every common sense notion of probable cause. Harlan was seized after he refused to agree to a personal search, but his seizure was not unreasonable. It was with probable cause. The motion to suppress is DENIED.[5]

---

**5.** Nothing to support the rather casual assertion that the search warrant was not validly issued was offered during the suppression hearing and that issue, if it is an issue, has been waived.