976 So.2d 1206 (2008)
STATE of Florida, Appellant,
v.
Taj Jevon DIXON, Appellee.
No. 4D06-3920.
District Court of Appeal of Florida, Fourth District.
March 26, 2008.
*1207 Bill McCollum, Attorney General, Tallahassee, and Mitchell A. Egber, Assistant Attorney General, West Palm Beach, for appellant.
Carey Haughwout, Public Defender, and Alan T. Lipson, Assistant Public Defender, West Palm Beach, for appellee.
STEVENSON, J.
Police approached Taj Jevon Dixon at the Amtrak train station. Ultimately, Dixon was searched, police found marijuana in his pocket and he was charged with possession. Dixon filed a motion to suppress the drugs, arguing he was stopped in the absence of reasonable suspicion and any subsequent consent to search was not voluntary. The trial court granted the motion to suppress and this appeal by the State followed. We affirm.
On July 27, 2005, narcotics detectives Camilo and Murray were working at the Amtrak station. The detectives were in plain clothes and were not there pursuant to any tip of criminal activity. The detectives observed Dixon exit a cab and proceed to the ticket booth. Detective Murray testified that, on his approach, Dixon looked at him and at the surrounding passengers and continued to do so as he exited the booth. Detective Murray and Dixon had had a prior encounter. Detective Camilo observed nothing unusual about *1208 Dixon's behavior  only that he was a little nervous.
At this point, Detective Murray decided to make contact with Dixon. Detective Camilo testified that after Dixon exited the ticket booth, he approached Dixon from the front and Detective Murray approached him from the rear. According to Detective Camilo, Detective Murray walked past Dixon and turned to face him with the result being that the two officers were standing in front of Dixon and face-to-face with him. Detective Murray could not recall precisely how they had approached Dixon, but agreed both he and Detective Camilo were ultimately in front of Dixon and facing him. In a prior deposition, Detective Murray indicated both officers approached Dixon from the front.
The detectives showed Dixon their badges and told him they were narcotics detectives. Detective Murray asked Dixon if he was riding the train and if he could see his ticket. Dixon handed Murray the ticket and the officers examined and returned it. At one point, Detective Murray testified that after returning the ticket to Dixon, he told Dixon they were investigating drug smuggling on the trains and, at another, he indicated he advised Dixon of their investigatory activities at the outset of the encounter. In any event, after hearing this information, Dixon became very nervous and his hands began to shake. The detectives testified they then asked Dixon for consent to search his person and he responded "yeah, go ahead." A bag of marijuana was found in Dixon's front, right pocket.
In his motion to suppress, Dixon contended (1) that the manner in which the officers approached him was such that the contact between him and police constituted an investigatory stop absent the required reasonable suspicionnot a consensual encounter and (2) that his consent was the product of this illegal detention and not voluntary. The trial judge granted the motion to suppress, remarking that, in reaching his decision, he had considered the credibility of the officers and had concerns about the conflict in the testimony regarding how the officers approached the defendant. On appeal, the appellate court is "required to interpret the evidence and the inferences and deductions that flow from it in the light most favorable to sustaining the court's ruling." Mays v. State, 887 So.2d 402, 403 n. 1 (Fla. 2d DCA 2004), approved, 959 So.2d 216 (Fla.2007). Any findings of fact made by the trial court are to be afforded deference where supported by the record, but the application of the law to these facts is considered de novo. See State v. Hackett, 944 So.2d 399, 401 (Fla. 4th DCA 2006).
In this case, there was no claim by the State, nor any testimony by the officers, to the effect that the police had the reasonable suspicion of criminal activity necessary to support an investigatory stop. The validity of the officers' search (and the admissibility of the evidence found) thus turns upon whether the contact between Dixon and the police can be characterized as a consensual encounter. "A consensual encounter is one that involves minimal police contact" and, during such an encounter, the citizen may either comply with the officer's requests or ignore them and leave. Graham v. State, 964 So.2d 758, 761 (Fla. 4th DCA 2007). "The mere questioning of an individual, including a police request for identification, does not amount to a Fourth Amendment detention." Id. (citing State v. Barnett, 572 So.2d 1033, 1034 (Fla. 2d DCA 1991)). "`The inquiry for determining when an encounter with the police should properly be deemed a seizure is centered around whether a reasonable person would feel free `to disregard the police and go about his business.''" P.W. v. State, 965 So.2d *1209 1197, 1199 (Fla. 4th DCA 2007) (quoting O.A. v. State, 754 So.2d 717, 720 (Fla. 4th DCA 1998) (citation omitted)). In making such an inquiry, the courts should consider the "totality of the circumstances." Id. "Some factors to consider that would indicate a seizure would be the `threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" Id. (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). An officer's request to search an individual does not, alone, convert a consensual encounter into an investigatory stop. Id.
Here, there was testimony before the trial court demonstrating that Dixon was aware of the presence of the two officers virtually from the moment he arrived at the station and, indeed, that he may have been aware of Detective Murray's identity as the two had had a prior encounter. As Dixon came out of the ticket booth, the officers approached him. There was evidence that as one detective approached from the front another approached from the rear, that the detective approaching from the rear passed Dixon and then stood in front of Dixon along side the detective who had approached from the front. There was evidence that, before police asked for permission to search Dixon, they (1) showed him their badges; (2) told him they were narcotics detectives working at the Amtrak station and that the reason for their contacting him was that there was a large problem with people smuggling drugs on the train; and (3) asked Dixon if he was riding the train and to produce his ticket.
Under these circumstances, and in particular the manner in which the detectives approached Dixon, i.e., one from the front and another from the rear who passed Dixon with the result being that both officers stood in his path, we find no error in the trial court's conclusion that the contact was not a consensual encounter and a reasonable person would not have felt free to disregard the detectives' questions and request to produce a ticket and simply proceed on his way. Compare United States v. Bowles, 625 F.2d 526 (5th Cir.1980) (finding contact was an investigatory stop, not a consensual encounter), with United States v. Simmons, 918 F.2d 476 (5th Cir. 1990) (finding contact was a consensual encounter), and State v. Poole, 730 So.2d 340 (Fla. 3d DCA 1999) (finding contact was consensual encounter). State v. R.H., 900 So.2d 689 (Fla. 4th DCA 2005), cited by the State, is distinguishable. There, police made casual conversation with the defendant, rather than, as here, immediately pulling out their badges and stating they were drug detectives. Further, in R.H., this court specifically found the evidence failed to establish that R.H.'s freedom of movement was hindered because the evidence was to the effect that the officers were standing next to one another. Id. at 693. In this case, while the end result was that the officers were standing next to one another and in front of Dixon, to accomplish this, police had approached from both the front and rear with the officer approaching from the rear essentially stepping into Dixon's path.
Affirmed.
TAYLOR, J., concurs.
STONE, J., concurs specially with opinion.
STONE, J., concurring specially.
I concur in affirming, but would emphasize that the officers actually blocked Dixon's *1210 path of walking to his train, which was at the station.