IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

--------------------

No. 91-4172

--------------------

UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

                    versus

IZEAL RIDEAU, JR.,

                              Defendant-Appellant.

--------------------

Appeal from the United States District Court
for the Eastern District of Texas

--------------------

(August 14, 1992)

Before POLITZ, Chief Judge, GOLDBERG, KING, GARWOOD, JOLLY,
HIGGINBOTHAM, DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO
M. GARZA, DeMOSS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

        This case requires us to consider the reasonableness of a
police officer's actions in an encounter with a person he suspected
was intoxicated, standing in the road, at night, in a high crime
area.  A panel of this court held that the officer violated the
Fourth Amendment when he reached out and touched the pants pocket
of the individual and discovered a gun.  We granted rehearing en
banc, and now hold that the officer's actions were reasonable under
the Fourth Amendment.

I.

At about 10:30 one night in July of 1989,[1] police officer Jimmy Ellison and his partner were driving toward the intersection of Bonham Street and Martin Luther King Boulevard, a high crime area in Beaumont, Texas, where people often carried weapons and transacted drug deals on the street, and where public drunkenness was a recurrent problem. As he drove up Bonham Street, officer Ellison saw a man wearing dark clothing standing in the road. Ellison flashed his bright lights to see the man better and to encourage him to get out of the street. The man turned to step out of the roadway and stumbled as he moved toward the shoulder. Ellison suspected that he was drunk. He pulled over, got out of his car, and approached the man to investigate. Ellison asked the man his name. He seemed nervous. When the man did not answer but instead began to back away, Ellison immediately closed the gap and reached out to pat the man's outer clothing. Ellison's quick move was to see if he had any weapons that could harm him or his partner. The first place he touched was the man's right front pants pocket, where he felt a firearm. He shouted "gun" to his partner and grabbed the man's arm. Ellison and his partner then put the man up against the patrol car, removed the gun from his pocket, handcuffed him and placed him under arrest.

The man was later identified as Izeal Rideau, previously convicted of robbery and burglary in Texas state court. Rideau was

---

[1] Defendant testified that the encounter occurred between 3:30 and 4:30 a.m. The arresting officer placed the time at 10:30 p.m.

charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1). Before his trial, he moved to suppress the gun, arguing that Ellison violated his Fourth Amendment rights when he stopped him and patted his pants pocket. The district court denied the motion to suppress, and a jury convicted Rideau. A panel of this court reversed Rideau's conviction on appeal, however, finding that although the officers were justified in detaining Rideau, they had failed to provide specific and articulable facts to justify a patdown, and thereby violated the Fourth Amendment's prohibition on unreasonable searches and seizures. We granted rehearing en banc to consider the issue further.

## II.

In <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), the Supreme Court explained the limits that the Fourth Amendment imposes on the conduct of police officers on the beat. First, it recognized that effective crime prevention and detection requires that officers be allowed to detain individuals briefly on the street even though there is no probable cause to arrest them. To justify such brief detentions, the officers must have a reasonable suspicion that criminal activity is afoot. The showing required to demonstrate "reasonable suspicion" is considerably less than that which is necessary to prove probable cause. In this context, the Fourth Amendment requires only some minimal level of objective justification for the officer's actions, measured in light of the

3

totality of the circumstances. See United States v. Sokolow, 109 S. Ct. 1581, 1585 (1989).

Second, the Court recognized that law enforcement officers need to protect themselves and the public at large from violence that may ensue in the course of such encounters. It therefore held that if police officers are justified in believing that the individuals whose suspicious behavior they are investigating at close range are armed and presently dangerous to the officers or to others, they may conduct a limited protective search for concealed weapons. Terry, 392 U.S. at 24; Adams v. Williams, 407 U.S. 143, 146 (1972). An officer need not be certain that an individual is armed; the issue is whether a reasonably prudent man could believe, based on "specific and articulable facts," that his safety or that of others is in danger. Id. at 27; Maryland v. Buie, 110 S. Ct. 1093, 1097 (1990).

In assessing the reasonableness of an officer's actions, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?". Terry, 392 U.S at 22 (citations omitted). The officer's state of mind, or his stated justification for his actions, is not the focus of our inquiry. See Maryland v. Macon, 472 U.S. 463, 470-71 (1985); Scott v. United States, 436 U.S. 128, 138-39 (1978); United States v. Colin, 928 F.2d 676, 678 (5th Cir. 1991). As long as all the facts and circumstances, viewed objectively, support the officer's

4

decisions, the Fourth Amendment is satisfied. We must attempt to put ourselves in the shoes of a reasonable police officer as he or she approaches a given situation and assesses the likelihood of danger in a particular context.

There is no serious question that Ellison had reasonable suspicion to detain Rideau. Rideau had been standing in the roadway at night in a high crime area, where public drunkenness was common, and stumbled out of the road only when Ellison flashed his lights at him. Ellison had reason to believe that Rideau was drunk. Since public intoxication is a criminal offense under Texas law, see Tex. Penal Code § 42.08 (Vernon's 1991), the officers had adequate grounds for a stop. In any event, Terry recognizes that "[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime." 392 U.S. at 13. Police have long served the public welfare by removing intoxicated people from the public streets, where they pose a hazard to themselves and others. See Powell v. Texas, 392 U.S. 514 (1968); see also Cady v. Dombrowski, 413 U.S. 433, 441 (1973) (describing "community caretaking functions" that police officers serve). Officer Ellison was warranted in stopping to investigate the situation and check on the man's condition.

We also find that Ellison's decision to reach out and pat Rideau's pocket rested on specific and articulable facts. A reasonably prudent man in Ellison's situation could have believed that his safety and that of his partner was in danger. Ellison

5

already had some reason to believe that Rideau might be intoxicated or perhaps injured. When approached and asked his name, Rideau did not respond but appeared nervous and, critically, backed away. It was not unreasonable under the circumstances for Ellison to have feared that Rideau was moving back to give himself time and space to draw a weapon. It was not then unreasonable for Ellison simply to touch Rideau's front pants pocket to determine whether he had a gun.

Rideau's specific moves took place after a detention, at night, in a high crime area where the carrying of weapons is common. These are articulable facts upon which a police officer may legitimately rely in justifying his actions. See Adams v. Williams, 407 U.S. 143 (1972); United States v. Laing, 889 F.2d 281, 286 (D.C. Cir. 1989); United States v. Trullo, 809 F.2d 108, 111 (1st Cir. 1987). Stripped from their context, the backward steps offer no threat, but to a police officer in Ellison's situation, they become very significant in the matrix of the general facts. Stated abstractly, specific actions may be construed as more or less hostile depending on the setting in which they occur. Of course, that an individual is in a high crime neighborhood at night is not in and of itself enough to support an officer's decision to stop or frisk him. Brown v. Texas, 443 U.S. 47, 52 (1979). But when someone engages in suspicious activity in a high crime area, where weapons and violence abound, police officers must be particularly cautious in approaching and questioning him. Trained, experienced officers like Ellison may

6

perceive danger where an untrained observer would not.  Id. at 52 n.2.  We are unwilling to tie the hands of police officers operating in potentially dangerous situations by precluding them from taking reasonable steps to ensure their safety when they have legitimately detained an individual.

We do not suggest that the police have a right to frisk anyone on the street at night in a high crime neighborhood.  There was no such rousting here.  First, as we have observed, the detention was proper, beyond cavil.  That is, only persons meeting the requirements of a Terry stop can be detained, and this detention did not rest solely on Rideau's presence in a bad part of town.  Second, after Rideau was lawfully detained, he responded to the request of the officer by backing away--a move which in this specific context was reasonably seen as threatening.  Ellison could reasonably believe that Rideau was gaining room to use a weapon.  Rideau had no legitimate right to be free of the minor invasion of his liberty that came in response to this behavior.  On these facts, there is no basis for concluding that the officer's concerns for his safety were unreasonable.  We reject the suggestion that Rideau's movement could not reasonably be seen as threatening because it at best presented a risk of flight.  The suggestion ironically discloses the emptyness of Rideau's asserted liberty interest.  The officer could have grabbed Rideau to keep him from fleeing.  It is perverse to suggest that he could not touch him to protect himself against the drawing of a weapon.

The scope of Ellison's "frisk" of Rideau is a relevant factor for us to consider. "The touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977) (quoting Terry); see also Michigan v. Long, 103 S. Ct. 3469, 3479 (1983). Reaching out to touch Rideau's pocket was a limited and tailored response to Ellison's fears for his safety, and served to validate his concerns. Its very spontaneity equally validates the objective reasonableness of the practical balance of safety and liberty. This was not the intrusive exploration of a detainee's body that the Court envisioned in Terry.[2] Rideau was not put up against a wall or across a car and subjected to a shake down. As we have observed, Ellison could have grabbed Rideau in a more invasive manner to prevent him from fleeing. Thus the minimal intrusion involved in this encounter is another factor supporting officer Ellison's decision.

The dissent accuses us of taking "significant liberties with both the facts and the law." It is settled that in reviewing this denial of a motion to suppress, we view the evidence taken both at the suppression hearing and at trial in the light most favorable to the ruling. United States v. Simmons, 918 F.2d 476, 479 (5th Cir.

---

[2] The Court described a frisk in Terry as follows: "'The officer must feel with sensitive fingers every portion of the prisoner's body. A thorough search must be made of the prisoner's arms and armpits, waistline and back, the groin and area about the testicles, and entire surface of the legs down to the feet.'" 292 U.S. at 17 n.13 (citation omitted).

8

1990).  The dissent turns the standard upside down, searching for any inference contrary to the district court's ruling, proceeding as if this ruling, by a veteran of thirty-six years on the trial bench, did not exist.  At trial, Rideau told a very different story about the street encounter, and the district judge simply did not believe him.  He denied walking away from the police officers, denied tripping or stumbling, and even denied that the gun was found in the frisk.  His story was that the police officers found a cocaine pipe in his sock and while on the ". . . way from putting me in the back of the vehicle . . . that's when I throwed the gun on the ground."  The dissent refers to our statement that Rideau "began to back away" as "at best misleading."  The arresting officer used these exact words in his testimony, and we are required to give credence to them.  Curiously, Judge Smith, in writing the panel opinion described the facts as follows:  "Ellison got out of the car and asked Rideau to identify himself.  Rideau began to back away."

We do not depart from the rule that police officers must have specific and articulable facts indicating that their safety is in danger to justify a patdown.  Nor do we assert that a lawful detention is a license to frisk.  We simply look to the reality that the setting in which the police officer acts may reasonably and significantly affect his decisional calculus.  A reasonably prudent man in officer Ellison's position could believe that he was in danger as he approached Rideau.  The minimally intrusive action that he took to ensure his safety and that of his partner was not

9

a violation of Rideau's constitutional rights. The Fourth Amendment does not require police to allow a suspect to draw first. This is East Texas, but it is 1992.

AFFIRMED.


JERRY E. SMITH, Circuit Judge, with whom POLITZ, Chief Judge, GOLDBERG, DUHE', and WIENER, Circuit Judges, join, dissenting:

The en banc majority takes limited but significant liberties with both the facts and the law. More importantly, the court today comes dangerously close to declaring that persons in "bad parts of town" enjoy second-class status in regard to the Fourth Amendment. Accordingly, I respectfully dissent from its well-intentioned view.


I.

In some important particulars, the facts in the record bear only a superficial resemblance to those set forth in the opinion for the en banc court. The pertinent portions of the record are brief and are reprinted in the two footnotes that follow. The first is from the transcript of the suppression hearing,[3] and the

---

[3]The pertinent portion of the transcript of the suppression hearing is as follows:

Direct examination of defendant Rideau (by his attorney):
. . .
Q. At the time of the arrest where were you standing?
A. On the street corner.
. . .
Q. You were at the corner of Martin Luther King Boulevard and Bonham Street?
A. Yes.
. . .
Q. Was there anyone with you?
A. No, sir.
Q. Were you just standing on the street corner at that time?

A. Standing on the street corner, on the side of the street.
Q. Did the officers approach you in a marked vehicle?
A. They came in a white )) black-and-white car with the siren on top.
. . .
Q. And did you walk away from them at all?
A. No.
Q. Did you remain standing at that position?
A. Yes.
Q. Had you been in the street at any time where you had tripped or stumbled?
A. No.
Q. After the officers approached you, did they place their hands on you?
A. Yes.
. . .

Cross-examination of defendant Rideau (by government counsel):
Q. What time of day was this, Mr. Rideau?
A. I guess it was 3:30, 4:30 in the morning.
. . .
Q. Would you agree with me that at least back on July of '89 that was a [] high crime area?
A. Not really.
Q. You thought that was a very safe place to go?
A. People live up there.
Q. I realize that. But there are lots of drug dealings going down in that area; is that correct?
A. Not at that time.
Q. I don't mean right at that minute; I mean that time in 1989 in July?
A. Yes.
Q. It has improved now. But at that point, it was not a place that you want your children to be walking around late at night?
A. No.
Q. You do not live in that area; is that correct?
A. Yes.
Q. You were, in fact, living in Liberty?
A. Yes.
. . .
Q. Isn't it a fact, that you were wearing warm up pants, dark warm up pants?
A. Yes.
Q. And what kind of a shirt were you wearing? Do you remember?
A. No.
Q. Dark in color, however?
A. I think so.
Q. Isn't it a fact, that when the officers were driving along the street, that you were in fact in the street area?
A. No.
Q. Isn't it a fact, that they flashed their headlights to get you to move out of the street?
A. No.
Q. They didn't do that at all?
A. No.
. . .
Q. Isn't it a fact, Mr. Rideau, that the officers pulled over and, without too much discussion, they patted the outside of your clothing?
A. Yes.
. . .

11

Direct examination of Officer Ellison (by government counsel):

. . .

Q. Were you in the area of Bonham and Martin Luther King at about 10:30 p.m. on that day?

A. Yes, ma'am.

Q. Did you happen to observe someone standing in the roadway of that area wearing dark clothing?

A. I did.

Q. What type of area is that, high crime, high crime area, that sort of thing?

A. Yes, ma'am, it is. There's a high crime area, drug trafficking, street deals, that type of thing.

Q. In your experience have you found people in that area also carry weapons?

A. Yes, ma'am.

Q. When you observed this person in the roadway with the dark clothing on, what action did you take?

A. When I saw the person standing there in dark clothing, I flashed my bright lights to see him better and make sure it was a person and if it was, hopefully, he would step out of the roadway.

Q. And did this person, in fact, step out of the roadway?

A. Yes, ma'am.

Q. Did you observe him make that move?

A. Yes, ma'am. As he stepped out of the roadway towards the shoulder, he began to stumble somewhat.

Q. So did you stop to check on his condition?

A. Yes, ma'am, I did.

Q. And when got out [sic] of your patrol car, which I assume you did, what action did you take?

A. I stepped out of the patrol car and approached him and asked him his name. And as I approached him, he began to back up from me, back away.

Q. So what did you do then?

A. At that time, concerned for my safety due to the area, time of night and his apparent nervousness, I reached out to pat his outer clothing for officer safety.

Q. Did you actual [sic] reach into a pocket or reach into his clothing?

A. No, ma'am, I did not.

Q. Specifically, what did you do?

A. I patted down his outer clothing, his outer pockets, normally [sic] pat down the outer pockets of any jacket or shirt, and his pants.

Q. And in this particular case, exactly what did you pat?

A. The first thing that I reached out [sic] was his right front pant's [sic] pocket.

Q. And what, if anything, did you notice when you touched that outer pocket?

A. When I touched that outer pocket, I felt what appeared to be a small firearm in the pocket? [sic]

Q. And what you did [sic] do then?

A. At that time I secured him and called out "gun" to my partner. And then my partner secured the other arm and I reached in and found it to be a small firearm and pulled it out of the pocket.

. . .

Cross-examination of Officer Ellison (by Rideau's counsel):

. . .

Q. And is there a street light at the corner of Martin Luther King and Bonham?

A. There's a street light near that corner.

Q. And how is the road surfaced?

12

second recounts the relevant portions of the trial before the

jury.[4]

A.  It's asphalt.
Q.  Does it have a curb and gutter or does it just have a shoulder?
A.  Just a shoulder, no curb and gutter.
Q.  At the time that you exited your vehicle, where was the Defendant?
A.  He was standing on the shoulder of the roadway.  I don't recall that there's a street light on that corner.
Q.  Now, at the time that you saw him move from the street, had you already flashed your lights?
A.  I flashed the bright lights at him as we were approaching in traffic.
Q.  And was he looking at you when you flashed the bright lights?
A.  Yes, sir.
Q.  Then after that you saw him removed from the street?
A.  Right.
Q.  Now, you're not pretending that it's a crime for a person to stumble are you?
A.  No, sir.
.  .  .
Q.  .  .  . [A]t what point in time did you determine that you were going to stop the Defendant and talk to him?
A.  After observing him stumble, as he moved out of the street.
Q.  Is there any other thing that made you determine that you were going to stop and talk to him?
A.  No, sir.


[4]The significant testimony from the trial regarding the search is as follows:

Direct testimony of Officer Ellison (by government counsel):
.  .  .
Q.  And how long have you been a police officer?
A.  Approximately six and a half years.
.  .  .
Q.  Tell us about that area.  What's in that vicinity, is it a residential, stores, factories, what?
A.  There is a small residential area that is similar to a project type area, there's a night club located about a block away from there.  Other than that, it's mainly commercial.
Q.  And back on July the 6th 1989, what type of a crime area was it?
A.  At that time, this area was an area with numerous drug type offenses: street buys of cocaine, lots of drunkenness, weapons, drugs and so forth.
Q.  You've experienced all or any of those in your experience as a patrol officer there?
A.  Yes, ma'am.
Q.  You would claim it to be a high crime area?
A.  Yes, ma'am.
.  .  .
Q.  What, if anything, did you observe?
A.  We observed a black male standing in the intersection of Bonham and M.L.K.
Q.  What type of clothing did he have on, do you recall?
A.  He had on dark clothing, is all we could tell from the distance.
Q.  I take it [sic] was hard to see him then?
A.  Yes, ma'am.

13

Q.  What, if anything, did you do when you observed this man in the street there . . .?
   . . .
A.  I just flicked the bright lights to see if it was someone standing in the road, and then turned them off.
Q.  What action, if anything, did the man take then?
A.  When he saw the bright lights, he had turned towards us, and began to step out of the roadway towards the shoulder.  He was near the corner.  And when he did, he stumbled or tripped or something.
Q.  You don't know if he tripped over anything, but you obviously noticed the stumbling and staggering?
A.  Right.
Q.  At the point that you observed him to stumble or stagger, was he still facing your patrol unit?
A.  He had turned to step out of the roadway, as he )) he saw us and then turned to step out of the roadway, and that was the time that he stumbled.
Q.  What did you think when you saw this stumbling?
A.  I thought that he may be intoxicated.
Q.  So what did you do?
A.  We passed through the intersection and stopped right there at the corner where he was standing.
Q.  He didn't try to run away or anything?
A.  No, ma'am.
Q.  Did he, in fact, get out of the roadway?
A.  Yes, ma'am.  He had already stepped out of the roadway and was standing on the shoulder at the corner.
Q.  And after pulling up to the vehicle, did you turn your siren on or anything like that?
A.  No, ma'am.  We just simply pulled over to the shoulder.
Q.  And did you get out of the vehicle then?
A.  Yes, ma'am.
Q.  Did your partner also get out?
A.  Yes, ma'am.
Q.  What did you do when you got out of your vehicle yourself?
A.  I was on the driver's side and my side of the vehicle was closest to him, I stepped out of the vehicle into the roadway and asked him who he was as I walked up to him.
Q.  I take it this is a very )) this is happening very quickly then?
A.  Yes, ma'am.  Just enough time to exit the vehicle and step a few feet towards him.
Q.  Okay. What, if anything, did you observe as you were approaching him?
A.  He began to back up as I spoke to him and approached him a little bit, he took a couple of steps backwards.
Q.  And so what did you do?
A.  At that time I reached out to pat down his outer clothing for any weapons or anything that could harm me or my partner.
Q.  Explain that a little better for us.  What was the purpose of reaching out and patting somebody when you haven't even struck up a conversation yet?
A.  Well, due to the high crime area, the time of the night ))
   . . .
Q.  Once again, what's the purpose of you [sic] patting somebody down in that area?
A.  The purpose of that is, a lot of times you have an area such as this, it is a high crime area, the officer is always concerned for his safety and any other citizens that could be nearby.  You pat down a person's outer clothing to determine if he's got any kind of weapons or knives, guns, et

14

As the transcript reveals, there is more to the facts than the majority has disclosed. Importantly, the majority opinion, as well as the government's oral argument, emphasizes Officer Ellison's suspicion that the defendant, Izeal Rideau, was drunk. In fact, at the suppression hearing (at the close of which the district court denied the motion to suppress the fruits of the search), absolutely no mention was made of intoxication. Instead, at that hearing

cetera, that could be quickly accessible to him before you could have a chance to get control of him, if he did try to go for them.
Q. You don't put them up against the wall, across your car?
A. No, ma'am. It's simple just to reach and pat of [sic] his outer pockets. There's no body search or anything like that. It's simply a pat down. . . . The first place that I patted him was his right front pant's [sic] pocket. . . . I felt an object in there that was consistent with a firearm. . . . At that time I squeezed the )) I still didn't reach into the pocket, I just grabbed it as to get control of it, and grabbed his arm and called out "gun" to my partner, who then grabbed his other arm and we placed him up against the patrol car . . . .
. . .
Q. What was the offense that you did, in fact, arrest him for?
A. Unlawfully carrying a weapon.
. . .

Cross-examination of Officer Ellison (by Rideau's counsel):
Q. Mr. Ellison, how far from the side of the roadway did you observe the Defendant?
A. Probably six to seven feet, approximately.
Q. Was he standing or moving towards the side of the roadway?
A. He was just standing.
Q. At the time that you flashed your bright lights, was he facing the vehicle?
A. I don't recall if he was facing the vehicle at the time that I turned the brights on. He had turned after I had the brights on; I could see him then, I could see his face.
Q. Did he fall all the way to the ground?
A. No, sir.
Q. More like a trip as he was walking to the side of the street?
A. Yes, sir.
. . .
Q. Now, as you were on patrol, did you stop everyone that night that you saw who tripped?
A. I don't recall doing that, no.
Q. Is it correct that the only reason that you stopped this man was because you saw him trip?
A. Saw him trip, thinking that he may be intoxicated, yes.
Q. But the trip is the only thing that you had suspicion about?
A. Compounded with standing in the roadway.
. . .
Q. By the time you got up to him, where was he?
A. He was standing on the shoulder in the southwest corner of those two streets.

15

Ellison, when asked at what point he decided to detain Rideau and talk to him, said, "After observing him stumble, as he moved out of the street."

Even if the mention of stumbling[5] could be understood as a proxy for intoxication,[6] Ellison used it as justification only for the stop, not for the frisk.  But at issue here is the patdown, for, as the majority says and the panel held, there is no dispute that the officers had justification to detain Rideau, at least briefly, under Terry v. Ohio, 392 U.S. 1 (1968).

Intoxication was never mentioned until the trial on the merits, when Ellison finally said that he at first thought Rideau might be drunk.[7]  He acknowledged that the only reason he stopped Rideau was that he saw him trip, "[c]ompounded with standing in the roadway."

There is no suggestion that, once Rideau had stepped the six or seven feet to the edge of the road, he was a threat to himself or others.  He did exactly what Ellison wanted him to do )) leave the roadway.  At that point his actions were those of a reasonable person and could be viewed, if anything, as cooperative.  Without more, there were no articulable facts to justify a search.

---

[5]The term "stumble" must be viewed in light of the entire record, for at another point Ellison answered "Yes" to the question whether Rideau's miscue was "[m]ore like a trip as he was walking to the side of the street."

[6]The stumbling cannot fairly be read as a surrogate for inebriation, for although, as the majority opinion states, public intoxication is a crime, Ellison answered "No" to the question, "Now, you're not pretending that it's a crime for a person to stumble are you?"

[7]In fact, Rideau was arrested not for public intoxication but for unlawful possession of a weapon.

The only justification offered by the majority is that Rideau "began to back away" as Ellison got out of his patrol car and walked toward him. This is, at best, misleading. Ellison's plain testimony is that Rideau only took "a couple of steps backwards" )) hardly the makings of a hasty retreat to gain room to draw a weapon.

In fact, the theory that Rideau intended, or appeared, to move back to give himself room to draw a gun is wholly the invention of the majority.[8] Officer Ellison's explanation is critically different. At the suppression hearing, without mentioning any fear that Rideau was retreating in order to produce a gun, Ellison simply states, in conclusionary terms, that "concerned for my safety, due to the area, time of night and his apparent nervousness, I reached out to pat his outer clothing for officer safety."

At the jury trial, Ellison's testimony was even more telling. It is obvious that his suspicion of Rideau was a product of Rideau's condition and circumstance, not )) as the majority opines )) a result of any action taken by the defendant. The search of Rideau, importantly, was conducted because of the general conditions in the neighborhood and not because of any articulable suspicion regarding Rideau.

Thus, asked "what's the purpose of you patting somebody down in that area?", Ellison's explanation was as follows:

_____

[8]Thus, the majority opines that "Ellison's quick move was to see if [Rideau] had any weapons that could harm him or his partner." Slip op. at 2. Nothing supports this claim except the majority's ipse dixit.

17

> The purpose of that is, a lot of times you have an area such as this, it is a high crime area, the officer is always concerned for his safety and any other citizens that could be nearby. You pat down a person's outer clothing to determine if he's got any kind of weapons or knives, guns, et cetera, that could be quickly accessible to him before you could have a chance to get control of him, <u>if he did try to go for them</u>. [Emphasis added.]

Remarkably, what Ellison unwittingly describes is akin to a general warrant[9] or to an indiscriminate dragnet-like procedure whereby all persons detained in a "bad part of town" are subject to search, not for anything they have done, but for the general purpose of ensuring the officer's safety or finding evidence of criminal activity. In other words, Ellison frisked Rideau not because Rideau <u>did</u> anything (i.e., stepped backward) to arouse individualized suspicion but because he was there, in a bad part of town, and, like <u>anyone else</u> in that area that night, <u>might</u> have had a weapon.

Thus, the search of Rideau was conducted not because he had started to draw a weapon )) or because a reasonable officer in Ellison's situation objectively might have believed as much. Instead, the patdown was effected to make sure that the officers would not be harmed if Rideau <u>should</u> decide to go for a gun )) a gun the officers had no reason to believe he even had. Unfortunately, however, for those who accept the dangers inherent

---

[9]"[I]ndiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." <u>Payton v. New York</u>, 445 U.S. 573, 583 (1980) (footnote omitted). <u>See generally</u> JACOB W. LANDYNSKI, SEARCH AND SEIZURE AND THE SUPREME COURT 19–42 (1966).

in law enforcement work, the Fourth Amendment does not provide officers with that hefty an insurance policy.

I must take issue, therefore, with the majority's assertion that "[i]t was not unreasonable under the circumstances for Ellison to have feared that Rideau was moving back to give himself time and space to draw a weapon."  Slip op. at 6.  Nothing that Rideau did showed that he )) any more than anyone else in that area that night )) was likely to endanger the police or the public.  Again, the Constitution requires specific and articulable facts.  An amorphous fear for one's safety, and the desire to take extra steps to guarantee that safety, are not enough.

In this regard, one must examine in some depth the details of Rideau's movements at the instant in question.  It is undisputed that he took only "a couple of steps backwards," a critical detail the majority fails to note.  First, a movement of two steps, without more,[10] is not enough to indicate that a suspect is trying to buy space in which to pull a gun, and no reasonable person could think as much.  Second, there is no reasonable ground for concluding that <u>that</u> specific action was more threatening than any other action Rideau could have taken.

By the government's own acknowledgement, and the majority's rationale, Rideau is caught in a classic "Catch 22."  That is, once

---

[10]"More" might include, for example, "furtive hand movements," a fact relied upon in a case cited by the majority, <u>United States v. Laing</u>, 889 F.2d 281, 286 (D.C. Cir. 1989), <u>cert. denied</u>, 494 U.S. 1008, and <u>cert. denied</u>, 494 U.S. 1069 (1990), or a bulge in the suspect's pocket, as in <u>United States v. Trullo</u>, 809 F.2d 108, 113 (1st Cir.), <u>cert. denied</u>, 482 U.S. 916 (1987), another case the majority cites.

the officers exited their vehicle and began walking toward him, there is nothing he could have done to save himself from a frisk. The action he took )) stepping back a couple of paces )) has been fantasized by the majority into a hastily conceived plot to draw a gun and fire on the officers.  But, as the government seemed to admit in oral argument, any other action, by that point, also would have been viewed as "suspicious."

For example, if Rideau had stepped forward, Ellison most certainly would have viewed it as threatening.  Had the defendant stepped to the right or left, it would have been interpreted as nervousness or an attempt to flee.  If Rideau had remained stiffly frozen in place, it would have been viewed, presumably, as a show of guilt or of abnormal behavior caused by drugs or alcohol.

Perhaps if Rideau had graduated from charm school and had been taught how to look "cool and collected" in the face of approaching uniformed officers, he could have managed to avoid the patdown. Otherwise, he was doomed to the intrusion that in fact occurred. Government counsel candidly admitted as much, at oral argument, by stating that Rideau was subject to search as soon as he was seen standing in the street, then tripping; in other words, Ellison did not even have to rely upon fear of his safety as an excuse for the frisk.

The Fourth Amendment proscribes only those searches that are unreasonable.  But it defies reason to base a justification for a search upon actions that any similarly-situated person would have taken.  The meat of the Terry analysis is that a search is

20

unreasonable if it is based not upon the individualized and unusual actions taken by the suspect but upon actions any reasonable person would or might have taken under the circumstances.

Indeed, one can surmise that many totally innocent citizens, upon seeing the approach of two uniformed officers, would take "a couple of steps" backward and would be surprised to learn that that normal reaction could subject them to a search of their person and the consequent invasion of privacy. This underscores the fact that Rideau was searched not because of anything he did but because of his status )) a person in a "bad part of town" where, presumably, people do not belong late at night, on the street, unless they are "up to no good." By that measure, almost any person in the vicinity of Martin Luther King Boulevard and Bonham Street that night could have been stopped and frisked.

The only "fact" that distinguishes Rideau from other such persons is that he was seen to stumble in the street while avoiding an oncoming car. But, as the panel held, that action alone reasonably subjected him only to a stop )) a brief inquiry by the officers to check on his condition )) and not to a search[11] of his

---

[11]The majority describes the search euphemistically. Thus, in its introduction, the majority states that Ellison "reached out and touched the pants pocket of the individual and discovered a gun." Slip op. at 1. Similarly, the majority refers to "Ellison's decision to reach out and pat Rideau's pocket, id. at 5, and says that the officer "simply [touched] Rideau's front pants pocket," id. at 6, and "[r]each[ed] out to touch Rideau's pocket," id. at 8. The phrase "reach out and touch" should be left to long-distance telephone commercials: The frank truth is that Rideau was searched.

The fact that the frisk in this case did not involve the anatomical exploration that the majority finds it necessary to describe graphically in quoting from Terry v. Ohio, 392 U.S. 1, 17 n.13 (1968), see slip op. at 8 n.2, makes it no less an intrusion governed by the Fourth Amendment. What the majority terms "a limited and tailored response," id. at 8, is the same "frisk for weapons" that the Supreme Court recently has reminded us

21

person.   This is why what was done to Rideau is tantamount to a general warrant, a dragnet, and why what happened to Rideau is precisely what the Constitution forbids.


## II.

The majority mentions only in passing, and fails to discuss, the most significant Supreme Court authority regarding this case. In <u>Maryland v. Buie</u>, 494 U.S. 325 (1990), the Court summarizes the law as it has developed since the seminal case of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  The Court reminds us that <u>Terry</u> authorizes only "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on 'specific and articulable facts,' . . . <u>and not on a mere 'inchoate and unparticularized suspicion or "hunch,"</u> . . . that he is dealing with <u>an armed and dangerous individual</u>.'"  <u>Buie</u>, 494 U.S. at 332 (emphasis added) (quoting <u>Terry</u>, 392 U.S. at 21, 27).

The majority concludes that "[a] reasonably prudent man in Ellison's situation could have believed that his safety and that of his partner was [sic] in danger."  Slip op. at 5.  But the Court in <u>Buie</u> )) a recent restatement of <u>Terry</u> )) words it in a way that requires much more: The officer must reasonably believe "that he is dealing with an armed and dangerous individual."  <u>Buie</u>, 494 U.S. at 332 (quoting

---

"'constitutes a severe, though brief, intrusion upon cherished personal security.'"  <u>Maryland v. Buie</u>, 494 U.S. 325, 332 (1990) (quoting <u>Terry</u>, 392 U.S. at 24-25).

22

*Terry*, 392 U.S. at 27). Significantly, this is phrased in the conjunctive: The suspect must be both armed <u>and</u> dangerous.

It is true that Rideau proved to be armed, but hindsight will not justify a search. As I have stated, the fact of tripping slightly in the street, coupled with his taking two steps backward, gave the officers no reasonable belief that he was armed. Moreover, absolutely nothing in this record supports a reasonable conclusion that, at the moment he was searched, Rideau was also "dangerous," to either the officers or others.

The majority also misreads the law regarding "specific and articulable facts." Emphatically, the Supreme Court in <u>Buie</u> has reiterated its warning in <u>Terry</u> that the officer's belief[12] that the suspect is "armed and dangerous" may not be based upon only "a mere inchoate and unparticularized suspicion or 'hunch.'" <u>Id.</u> (first internal quotation marks omitted).[13]

Yet, such an impermissible "hunch" is the very most that Ellison seems to be describing when he states, "The purpose of [the patdown] is, a lot of times you have an area such as this, it is a high crime area, the officer is always concerned for his safety . . . ." In fact, this statement seems not even to describe a hunch but rather a <u>general practice</u> of searching all suspects in high-crime areas, even without individualized suspicion. The only other factor that Ellison relied upon was Rideau's "apparent

---

[12]The majority properly notes that we judge an officer's actions against an objective standard; Ellison's state of mind is not directly at issue, though his factual observations are.

[13]The majority does not mention this critical passage.

23

nervousness," but there is nothing about such a trait that would indicate to a reasonable officer that a person is armed and dangerous.[14]

This is the heart of the instant case. The essential question for the en banc court today is whether an officer may use the general conditions in a particular part of town as justification for a search, where the suspect is guilty of no culpable conduct

---

[14]In <u>Brown v. Texas</u>, 443 U.S. 47, 52 (1979), the Court said the fact that the defendant "looked suspicious" was not enough:

> Officer Venegas testified . . . that the situation in the alley "looked suspicious," but he was unable to point to any facts supporting that conclusion . . . .  The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.  In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood.

(Footnote omitted.)

> Similarly,

> it has properly been held that the "hesitancy of a car to pass a police cruiser and a glance at the police officer by a passenger," a "startled look at the sight of a police officer," appearing nervous when a police car passed, looking away from police activity in the vicinity, pointing toward police, or quickening one's pace upon seeing the police are not, standing alone, sufficient basis for an investigative stop.

3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.3(c), at 450-51 (2d ed. 1987) (footnotes omitted).  <u>Accord</u> <u>United States v. Carter</u>, 369 F. Supp. 26, 27-30 (E.D. Mo. 1974) (no justification for stop where occupants of car "appeared [to officer] to be nervous" and "appeared surprised and disturbed at the presence of the police officer").

"Nervousness in the presence of a police officer does not furnish a reasonable basis for a detention . . . ." <u>People v. Loewen</u>, 672 P.2d 436, 441 (Cal. 1983).  "Nervousness on the part of a black laborer when confronted by an armed uniformed officer does not seem so unusual as to indicate guilt or criminal proclivity." <u>State v. Scott</u>, 412 So. 2d 988, 989 (La. 1982).

but merely reacts as any reasonable person would under the circumstances.[15]

In Buie, the Court addresses this question specifically:

[D]espite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, . . . [e]ven in high crime areas, where the possibility that any given individual is armed is significant, Terry requires reasonable, individualized suspicion before a frisk of weapons can be conducted.

Id. at 334 n.2.

The majority does not attend to this important passage from Buie. It sets forth, as the only articulable facts upon which it relies, that the officers had reason to believe Rideau was intoxicated or injured; that when approached, Rideau "did not respond but appeared nervous and, critically, backed away"; and that "Rideau's specific moves took place after a detention, at night, in a high crime area where the carrying of weapons is common." Slip op. at 5-6.[16]

---

[15]"The 'high crime area' factor is not an 'activity' of an individual. Many citizens . . . are forced to live in areas that have 'high crime' rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends. The spectrum of legitimate human behavior occurs every day in so-called high crime areas." People v. Bower, 597 P.2d 115, 119 (Cal. 1979).

[16]The majority avers that "[t]hese [i.e., Rideau's specific moves taking place after a detention, at night, in a high crime area where weapons were common] are articulable facts upon which a police officer may legitimately rely in justifying his actions." Slip op. at 6. While these are permissible factors, the majority mentions only one Supreme Court case )) Adams v. Williams, 407 U.S. 143 (1972) )) in support.

Williams is inapposite, though, as a review of the instant record shows how vapid the present facts are in comparison to those in Williams. There, an officer was on patrol in a high-crime area when a known informant told him that the defendant was nearby in a car, carrying narcotics and a gun. The officer proceeded to reach into the defendant's vehicle and remove the weapon from his waistband. The Court concluded that "[w]hile properly investigating the activity of a person who was reported to be carrying narcotics and a concealed weapon and who was sitting alone in a car in a high-crime area at 2:15 in the morning, [the officer] had ample reason to fear for his safety."

25

The majority takes pains to state that "[o]f course, that an individual is in a high crime neighborhood at night is not in and of itself enough to support an officer's decision to stop or frisk him." Id. at 6.[17] So, it is only what the majority terms Rideau's "suspicious activity," id., that the majority adds to the equation to tip the scales in favor of the frisk. But it is a challenge to the imagination to say that Rideau's actions were "suspicious," and certainly there was nothing about them that gave rise to a reasonable suspicion that he was armed and dangerous.

Thus, the majority in this case has installed the very rule it attempts to deny: that, practically speaking, any person in a high-crime area (or "bad part of town") late at night is subject to

_____

Id. at 147-48 (footnote omitted). The Court even emphasized that its case was "stronger . . . than obtains in the case of an anonymous telephone tip," id. at 146, thus suggesting that an anonymous tip might not have been enough to justify the search, even in a high-crime area.

The Court reiterated the Terry rule as follows: "[T]he policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect. 'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous . . .,' he may conduct a limited protective search for concealed weapons." Id. (emphasis added) (quoting Terry, 392 U.S. at 24). Rideau was not "hostile," and his actions were not "suspicious."

[17]"The [majority] doth protest too much, methinks." WILLIAM SHAKESPEARE, HAMLET act III, sc. ii, ln. 242. The majority belabors its disclaimer, as though repetition can make it so. E.g., "Of course, that an individual is in a high crime neighborhood at night is not in and of itself enough to support an officer's decision to stop or frisk him," slip op. at 6; "[w]e do not suggest that the police have a right to frisk anyone on the street at night in a high crime neighborhood," id. at 7; "[w]e do not depart from the rule that police officers must have specific and articulable facts indicating that their safety is in danger to justify a patdown. Nor do we assert that a lawful detention is a license to frisk," id. at 9. The unfortunate fact is that by allowing an innocent action, such as taking two steps backward, to turn a situation in which no search is permitted into one in which a search is justified, the majority in effect has adopted the rule it purports to eschew: that being in the wrong part of town at the wrong time of day deprives one of significant Fourth Amendment protections.

26

a frisk.  Such a maxim could make the directive to "round up the usual suspects" the order of the day.

### III.

The majority expresses a concern that I share regarding officer safety )) a problem important enough to warrant separate discussion.  In <u>Buie</u>, <u>Terry</u>, and elsewhere, the Supreme Court has provided that a search can be reasonable under some circumstances when effected to ensure safety in the field, when spur-of-the-moment encounters reasonably raise the specter of danger to an officer or to others.  It is also plain, however, that such concerns do not automatically trump the Fourth Amendment.

The safety of police officers undoubtedly would be enhanced if, when entering a high-crime area for a legitimate purpose, they could briefly and effectively search all persons in the area for weapons.  The salutary interest of law enforcement would be served by such a rule, but it would come at the unacceptable expense of intrusions upon innocent members of the public as to whom there is no reasonable suspicion of wrongdoing.  Our Bill of Rights does not permit such intrusions.

The majority, slip op. at 10, reminds us that this is 1992, presumably referring to the growing problem of drugs and crime in our inner cities and to the consequent dangers that confront well-meaning law enforcement personnel who enter there to do their jobs. But only two years ago, in 1990, the Supreme Court reminded us that the proscription of unreasonable searches is alive and well despite

27

the obvious peril to officers that can be  presented by limiting their ability to conduct street searches.  The Court's words are poignant, so I quote them again:

> [D]espite the danger that inheres in on-the-street encounters and the need for police to act quickly for their own safety, the Court in <u>Terry</u> did not adopt a bright-line rule authorizing frisks for weapons in all confrontational encounters.  <u>Even in high crime areas, where the possibility that any given individual is armed is significant</u>, <u>Terry</u> requires reasonable, individualized suspicion before a frisk for weapons can be conducted.

<u>Buie</u>, 494 U.S. at 334 n.2 (emphasis added).

We must remember, too, that this is not an all-or-nothing matter.  By imposing limits on searches, the Constitution and the Supreme Court have not left the police unprotected.  The requirement of individualized suspicion merely ensures that officers receive greater protection in those instances in which they are most likely to be in danger.  That is the essence of the requirement that searches be "reasonable."

Like the rule of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the lesson of <u>Buie</u> and <u>Terry</u> makes law enforcement more difficult.  Much as police officers must learn to administer the warnings required by the Court in <u>Miranda</u>, they likewise must be aware of the constraints upon searches in the street and must accept their jobs with that understanding.[18]

---

[18]Today's holding enhances an officer's opportunity to use general terms such as "nervousness" and "suspicious behavior" as pretexts to conduct searches of persons who the officer has no reason to believe has done anything wrong.  The requirement of "specific and articulable facts" should encompass more than the routine use of such generalities.

This is no criticism of Officer Ellison. He is accused of no wrongdoing or malice, and his actions are subject to reasonably differing legal interpretations that today divide our en banc court. The search he conducted on defendant Rideau was in accordance with proper procedure as he understood it and was in the interest of law enforcement. The majority has put its stamp of approval on his conduct; concluding that he crossed the constitutional line, I disagree.

IV.

Finally, I wish to comment upon the status of this case as an en banc rehearing. Interestingly, the government never requested either en banc or panel rehearing in this matter. Nor, as often is its practice, did it even seek an extension of time in which to suggest rehearing en banc, in order to seek permission from the Solicitor General.

Presumably, this is because the Department of Justice and the interests it represents perceived no jurisprudential danger from the panel's conclusion that the fruits of the instant search should be suppressed. This case was routine, made no new law, and should not have been reviewed en banc. The panel opinion posed no threat to officer safety, and the government's reaction to it showed as much.[19]

_____

[19]I do not mean to posit that this court should never consider cases en banc when no party has suggested it. In fact, we have done so twice recently in cases implicating the Fourth Amendment. I.e., United States v. Pierre, 943 F.2d 6 (5th Cir. 1991) (sua sponte granting rehearing en banc); United States v. DeLeon-Reyna, 908 F.2d 1229 (5th Cir. 1990) (same). But we should take an

29

By taking the case en banc and fashioning today's ruling, the court has run afoul of the Constitution and Supreme Court precedent and has rendered the Fourth Amendment essentially meaningless in an entire category of ordinary street encounters.  Despite the good intention of the majority to protect our officers on the street, I respectfully dissent.

---

extra look when the agency charged with enforcing the laws of the United States, and not known for its timidity in Fourth Amendment cases, decides that a case it has lost is not worthy of en banc review.