JERRY E. SMITH, Circuit Judge,
with whom POLITZ, Chief Judge, KING, DUHÉ and WIENER, Circuit Judges, join dissenting:
Concluding that the majority has strayed from the dictates of the Supreme Court and from the recent pronouncements of this court sitting en banc, I respectfully dissent. The majority, although purporting to rely upon Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), fails to mention, much less to apply, the central requirement of that case: that the Constitution requires “individualized suspicion” and authorizes only “a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on ‘specific and articulable facts,’ ... and not on a mere ‘inchoate and unpartieularized suspicion or “hunch,” ’... ‘that he is dealing with an armed and dangerous individual.’....” Maryland v. Buie, 494 U.S. 325, 332, 334 n. 2, 110 S.Ct. 1093, 1097, 1098 n. 2, 108 L.Ed.2d 276 (1990) (emphasis added) (quoting Terry, 392 U.S. at 21, 27, 88 S.Ct. at 1879, 1883). In no respect does the record in this case support the conclusion that Officer Perry had reason to think defendant Michelletti was both “armed and dangerous.”
I.
First, I take issue with the facts set forth by the district court in its factual findings and by the majority in its opinion. In its written order, the district court made only truncated findings regarding the question of Michelletti’s dangerousness:
6. Officer Perry observed the defendant exiting the rear door of the bar with a container of beer in his left hand, and his right hand in his pocket.
7. Officer Perry testified that his experience as a police officer has proven confrontations between patrons and police officers are likely to occur during closing time at bars. Further, he feared for the safety of himself and his partner, and determined a search of the defendant for weapons was justified. He testified he was being extremely careful, since a fellow officer had recently been shot.
*846 There is no evidence that in regard to anything Michelletti did or said, Perry “feared for the safety of himself and his partner.” The testimony is to the contrary. Asked whether “anybody [did] anything threatening toward you or your partner,” Perry replied, “I wouldn’t say anybody did anything threatening, no, sir.” When asked whether “[t]he fact that he had his right hand in his pocket and according to you a beer in his left, that was a suggestion to you that he was armed and threatening?,” Perry answered, “No, sir, that was not a suggestion that he was armed.” Perry later added, “No, he had not done any overt actions at that time.”
Accordingly, the district court clearly erred in stating that Perry was in fear at the time he ordered Michelletti to undergo a search. Without that factual predicate, Terry and Buie cannot be satisfied, for the district court is left only with the findings that Michelletti exited the bar with a beer in one hand and the other hand in his pocket and that Perry was generally aware that confrontations occur with some regularity outside bars at closing time. Nothing about these facts provides the “individualized suspicion,” Buie, 494 U.S. at 334 n. 2, 110 S.Ct. at 1098 n. 2, that the law requires to show that Michelletti was “armed and dangerous.”
Nor does the majority report the facts with sufficient reliability. Perry testified that Michelletti came “straight out of the bar.” There is no indication that when he exited the bar, Michelletti “walked toward the policeman and a group of individuals he was about to question.” Majority opinion at 839. This casts a shadow on the majority’s assertions that “Michelletti noisily emerged from the bar, beer in hand, and approached the entire group,” id. at 841, that Michelletti made “purposeful strides toward the group that Perry had just encountered behind the lounge,” id. at 842, that Michelletti made an “alcoholic and deliberate approach,” id. at 842, and that “Michelletti ... was heading straight toward him ...,” id.
The fact is that, assuming arguendo that Perry had reason to think Michelletti was doing something suspicious, nothing in the record supports the conclusion that he posed a threat to anyone. So, the most that was called for was a momentary stop for questioning, not a search for weapons. That is the only possible justification for the search in question, a Terry search for weapons for the sole purpose of protecting those persons on the scene.
The testimony at the suppression hearing provides no suggestion that Michelletti was acting in concert with the three suspects the officers were observing outside the bar. All Michelletti did was to exit a bar at closing time. Although the majority tries to make much of potential violations of state liquor laws, the government now has conceded that Michelletti was guilty of no liquor law infraction. Yet, he was subjected to a patdown for leaving the bar with a beer in one hand and the other hand in his pocket.
II.
The scope of the search conducted on Mi-chelletti is questionable. Recently in United States v. Rideau, 969 F.2d 1572 (5th Cir.1992) (en banc), this court described the limits of permissible police street encounters. There, the majority opined that “[t]he scope of [the officer’s] ‘frisk’ of Rideau is a relevant factor for us to consider.... Reaching out to touch Rideau’s pocket was a limited and tailored response to [the officer’s] fears for his safety....” Id. at 1575. Importantly, the court added the following: “[The defendant] was not put up against a wall or across a car and subjected to a shake down.” Id. at 1576.
Memories are short. A little more than a year after Rideau, the majority today endorses the very procedure that the majority in Rideau condemned. Perry did much more than “touch [Michelletti’s] pockets.” In Perry’s words, he instructed Michelletti “to set the beer down on the car and put his hands on the car. And then I proceeded to perform a pat down search on him for weapons.”
III.
In summary, the only “specific and articu-lable facts” that the record even remotely *847 supports to link Michelletti to suspicious activity are that he exited a bar with a beer in one hand and his other hand in his pocket. He was in violation of no law (except of course the weapon possession with which he was charged, a fact the officer could not have known ex ante).
These facts are in conspicuous contrast to those in Rideau. There, this court construed the defendant’s actions as threatening:
When approached and asked his name, Rideau did not respond but appeared nervous and, critically, backed away. It was not unreasonable under the circumstances for [the officer] to have feared that Rideau was moving back to give himself time and space to draw a weapon....
... [A]fter Rideau was lawfully detained, he responded to the request of the officer by backing away — a move which in this specific context was reasonably seen as threatening. [The officer] could reasonably believe that Rideau was gaining room to use a weapon.
969 F.2d at 1575.
The distinction is that once confronted by the officers in their execution of a valid Terry initial detention for questioning, the defendant in Rideau continued to engage in what the majority called suspicious activity. Moreover, that activity was viewed as directed toward the officers and implicating their safety, i.e., backing away to draw a gun on the officers. The majority held that this further activity entitled the officers to take the Terry stop one step further, as “[a] reasonably prudent man in [the officer’s] situation could have believed that his safety and that of his partner was in danger.” Id. at 1574.
By contrast, no reasonable officer could have believed that Michelletti was “armed and dangerous” except on the basis of the sort of “inchoate and unparticularized suspicion or ‘hunch’ ” that Buie condemns. See Buie, 494 U.S. at 332, 110 S.Ct. at 1097 (quoting Terry, 392 U.S. at 21, 88 S.Ct. at 1879). Perry’s testimony directly undermines the majority’s unsubstantiated claim that Michelletti walked toward the officers and that that action was threatening. Perry stated, “[H]e looked at me, we made eye contact, but then he looked away and acted as though I was not there and tried to walk on by.” (Emphasis added.)
Also in sharp and significant contrast to the situation in Rideau is the fact that Mi-chelletti, instead of continuing in suspicious activity once he was addressed by Perry, immediately cooperated:
I asked him to come over here — at the time I was already out of my car — to come toward me so that I could check him for weapons. At that time I asked him to set the beer down on the car and put his hands on the car. And then I proceeded to perform a pat down search on him for weapons.
While there may have been reason for the officers to question Michelletti briefly, under Terry, to see whether illegal activity was afoot, the total absence of threatening or suspicious conduct at that moment deprived the officers of justification to conduct a full-blown patdown of Michelletti’s person.[1]
Even if we were to assume — contrary to any hint in the record or the district court’s findings — that Michelletti was walking toward the three men who had been seen moving toward the bar’s rear parking lot, his mere association with them did not justify a search, absent some suspicious conduct on his part. In Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979), the Court pointedly observed that
a person’s mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person.... [The requirement of particularized suspicion] cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another ... where the person may happen to be. The Fourth and Fourteenth *848 Amendments protect the ‘legitimate expectations of privacy of persons, not places.
Accordingly, in Ybarra the Court found no particularized suspicion even though Ybarra was in a bar next to a person whom the police had a warrant to search. Similarly, in Brown v. Texas, 443 U.S. 47, 52, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979), the Court held that the police failed to demonstrate a particularized suspicion of two persons who were walking away from each other in an alley in a high-crime neighborhood and who “looked suspicious.”
An examination of cases in which the Court has found individualized suspicion is instructive. Remarkably, the majority attempts to compare the facts here favorably to those in Terry. There, an experienced police officer on his beat observed in detail, for ten to twelve minutes, the suspicious activities of three men as they “cased” some retail stores, apparently in preparation for a robbery. Terry, 392 U.S. at 5-6, 88 S.Ct. at 1871-1872.[2] It was obvious to any reasonable officer that if a robbery was being planned, one or more of the suspects would have a gun. So, it was only logical for the officer, when conducting the initial Terry stop, to search for weapons, which he indeed found.
The officer’s observation of several minutes’ duration in Terry is in marked contrast to the instantaneous conclusion here to search Michelletti without any real reason to think he was both “armed and dangerous.” See Adams v. Williams, 407 U.S. 143, 147-48, 92 S.Ct. 1921, 1923-24, 32 L.Ed.2d 612 (1972) (holding that officer had particularized suspicion that defendant was armed and presently dangerous where a known informant reported moments earlier that the defendant was carrying narcotics and a concealed weapon, and defendant was sitting alone in a car in a high-crime area at 2:15 a.m.). It is astonishing that the majority asserts that in the instant case, “Perrys suspicion was no less reasonable than that which the Supreme Court approved in Terry.” Majority op. at 842.
IV.
What the majority today has done is to espouse a “group danger” theory of search justification that is, to say the least, troubling. That theory seems to say that if a person finds himself amongst other persons who may pose a danger, or in a circumstance that, because of the time of day or the part of town, may suggest an increased possibility of criminal activity, that person may be searched without “particularized facts” or individualized suspicion” as to him.
The majority begins its explication of this theory by establishing reasonable suspicion as to the other men outside the bar:
There should be no question that the police officer articulated a reasonable basis to investigate the group of patrons standing outside the rear of Alacran’s lounge. This issue was not really disputed in the district court. The man who had just turned and run evasively at the mere sight of a patrol car had joined two others. The police could not know what these actions *849 might mean, but they were entitled to find out.
Id. at 841. Significantly, Perry testified that “at that very instant, there was nothing threatening except for the fact that one subject that I had first seen was coming around the comer and he was slightly out of breath.”
It is uncontroverted that that person was one of the three others, not Michelletti. But the majority insists upon making Michelletti answerable to the situation at hand and subject to search because of it:
Other circumstances surrounding the encounter signaled a need for caution. First, it was closing time at a bar, a late hour when the presumably well-lubricated habi-tués would begin heading for home — or for trouble. The officers were well aware of a higher likelihood of angry confrontations at closing time. Second, the officers did not know whether they were confronting one suspect, two suspects, or all four of the men outside the bar as suspects in criminal activity. The size of the group added to the calculation of danger for the police and for any of the group’s innocent members.
Id. at 842-43.
The flaw in this approach is that it eviscerates the requirement of individualized suspicion that is so basic to our Fourth Amendment jurisprudence. As the Court explained in Ybarra, 444 U.S. at 91, 100 S.Ct. at 342, one’s physical proximity to suspicious persons does not subject him to search. The dangerousness of the overall situation does not erode one’s expectation of privacy and subject him even to a patdown — a “frisk for weapons” that the Supreme Court recently has reminded us “ ‘constitutes a severe, though brief, intrusion upon cherished personal security.’ ” Buie, 494 U.S. at 332, 110 S.Ct. at 1097 (quoting Terry, 392 U.S. at 24-25, 88 S.Ct. at 1881-1882).
Equally alarming is the emphasis placed by the district court and today’s majority on the officer’s awareness that a fellow officer had been fatally shot only two weeks earlier. See Majority op. at 844. The killing of peace officers is a tragic and deplorable, but not wholly avoidable, consequence of that line of work. Terry and its progeny afford officers a reasonable opportunity to ensure their safety in the field, but only where the suspect at hand has aroused individualized suspicion. There is no hint in our or the Supreme Court’s Fourth Amendment pronouncements that the recent death of another police officer somewhere else in a large city can in any way erode the constitutional rights of those who thereafter walk the streets of that city.
The majority also emphasizes the dramatic increase in death and injury among police officers. Again, the statistics are frightening, and one must have sympathy for officers who daily put themselves in harm’s way. But again, these unhappy facts must not be allowed to intrude upon the security of the person in his freedom from unreasonable searches and seizures.
Protection of constitutional rights is most significant at the margins. Vigilance in protecting free speech, for example, is most important where the speech is unpopular, though such protection may be both more distasteful and more difficult. Likewise, recognition of basic liberty interests is most crucial where countervailing and sympathetic interests such as police safety are implicated.
The fact is that in an imperfect world, absolute protection for officers is not possible, nor is freedom from reasonable searches. That is why the law requires that the officer reasonably believe the suspect is armed and presently dangerous. Justice Scalia recently opined, in regard to a physical search, that “I frankly doubt ... whether the fiercely proud men who adopted our Fourth Amendment would have allowed themselves to be subjected, on mere suspicion 'of being armed and dangerous, to such indignity....” Minnesota v. Dickerson, — U.S. -, -, 113 S.Ct. 2130, 2140, 124 L.Ed.2d 334 (1993) (Scalia, J., concurring). Concluding that no reasonable officer could have believed that Michelletti was both armed and presently dangerous, I respectfully dissent.

. As the majority rightly notes, the state court of appeals, albeit with a record different from the one before us, concluded that the officers had not articulated sufficient facts to justify the Terry frisk. See Majority op. at 841 n. 3.

. The Court described the salient facts as follows:
[The officer] saw one of the men leave the other one and walk ... past some stores. The man paused for a moment and looked in a store window, then walked on a short distance, turned around and walked back toward the comer, pausing once again to look in the same store window. He rejoined his companion at the comer, and the two conferred briefly. Then the second man went through the same series of motions, strolling down [the street], looking in the same window, walking on a short distance, turning back, peering in the store window again, and returning to confer with the first man at the corner. The two men repeated this ritual between five and six times apiece — in all, roughly a dozen trips. At one point, while the two were standing together on the corner, a third man approached them and engaged them briefly in conversation. This man left the two others arid walked west[, and the first two] resumed their measured pacing, peering and conferring. After this had gone on for 10 to 12 minutes, the two men walked off together, heading west ..., following the path taken earlier by the third man.
By this time Officer McFadden had become thoroughly suspicious. He testified that after observing their elaborately casual and oft-repeated reconnaissance of the store window ..., he suspected the two men of “casing a job, a stick-up,” and that he considered it his duty as a police officer to investigate further. He added that he feared "they may have a gun."
Terry, 392 U.S. at 6, 88 S.Ct. at 1872.