**UNITED STATES of America, Plaintiff,**

v.

**Andre GILMORE, Defendant.**

**Criminal Action No. 13–cr–0034–WJM.**

United States District Court,
D. Colorado.

May 14, 2013.

David M. Conner, U.S. Attorney's Office, Denver, CO, for Plaintiff.

Brian Rowland Leedy, Office of the Federal Public Defender, Denver, CO, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

WILLIAM J. MARTÍNEZ, District Judge.

In this action, Defendant Andre Gilmore ("Defendant") is charged in Count 1 of the Indictment with unlawful possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1). (ECF No. 9.) This matter is before the Court on Defendant's

Motion to Suppress ("Motion"). (ECF No. 13.) Defendant's Motion seeks suppression of the evidence obtained and statements resulting from the stop, pat-down search, and arrest of Defendant. (*Id.*) The Government filed a Response to the Motion. (ECF No. 17.) No Reply was permitted. (ECF No. 18.)

On April 29, 2013, the Court held an evidentiary hearing on the Motion. (ECF Nos. 19–20.) Both parties were represented at the hearing by counsel, and were given a full opportunity to present witness testimony. Six witnesses testified for the Government at the hearing, including two parking attendants and a security guard stationed in the parking lot where Defendant was initially detained, two police officers involved in the stop and frisk, and an officer who interviewed Defendant. Defendant did not testify. The Court permitted brief closing statements after receipt of all of the evidence.

After carefully considering the evidence presented, counsel's arguments in their briefs and at the hearing, and the applicable law, the Court DENIES the Motion to Suppress in its entirety.

## I. BACKGROUND

The testimony provided by the witnesses at the evidentiary hearing was largely consistent regarding the material facts. The Court finds credible the testimony of all of the witnesses, both because of their demeanor and because of the lack of inconsistencies in their testimony. *See United States v. DeJear,* 552 F.3d 1196, 1200 (10th Cir.2009) (at a suppression hearing, "[t]he credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court"). Based upon the parties' submissions and the evidence introduced at the evidentiary hear-

ing, the Court finds the relevant facts as follows:

On January 13, 2013, Jason Morris and Richard Gomez were working as parking lot attendants in Parking Lot C at the National Western Stock Show in Denver, Colorado. Parking Lot C was located adjacent to the "cattle tie out" area, an area where livestock exhibitors held their cattle. The cattle tie out area was not open to the public. Lot C was a pass-only lot generally used by the exhibitors associated with the cattle and was not designated for the public. Lot C and the cattle tie out area were both bordered by fences, but the entrances and exits stood open for exhibitors to come and go. Exhibitors parking in Lot C were generally dressed in "rancher" style clothing and possessed exhibitor badges.

At approximately 11:00 a.m., Morris and Gomez noticed a man later identified as Defendant entering Lot C on foot through the exit driveway in the southeast corner of the parking lot. Morris verbally greeted Defendant, but Defendant did not respond, instead continuing to walk past Morris toward the cattle tie out area. Morris noted that Defendant was swaggering or swaying and appeared to be intoxicated. Gomez noted that Defendant was not dressed like a rancher, and that he had not seen Defendant in Lot C before. He also noticed that Defendant was walking in a swerving manner and appeared to be talking to himself. Gomez began following behind Defendant, monitoring his route as Defendant walked into the cattle tie out area. Gomez then verbally reported Defendant's presence to Vincent Garcia, who was a Stock Show security guard stationed in Lot C.

Garcia used a radio transceiver to communicate Defendant's presence to his supervisor, who in turn informed a police dispatcher. Via radio, the dispatcher re-

ported a brief description of Defendant, stated where he was located, and indicated that he was a suspicious party who was disoriented. Two officers of the Denver Police Department, Lieutenant Vincent Gavito ("Lt. Gavito") and Sergeant Dino Gavito ("Sgt. Gavito") (collectively "the Officers"), were working at the Stock Show and responded to the dispatcher's call. The Officers were aware that several thefts from vehicles had occurred in Stock Show parking lots in the days prior, although none had occurred in Lot C. The Officers drove into Lot C, and Gomez directed them to the area where Defendant was located. The Officers spoke briefly with Garcia, the security guard, who pointed out Defendant and stated that he appeared very disoriented or intoxicated.

By the time the Officers arrived, Defendant had walked to the north end of the cattle tie out area, which was closed off by a fence, and stood there for a moment before turning back toward the entrance to the cattle tie out area. The Officers drove through the entrance and parked their vehicle facing Defendant, as Defendant continued walking toward the entrance where the Officers were waiting.

The Officers noted that Defendant was wearing a maroon or burgundy overcoat over a second dark coat, dark jeans, and tennis shoes, and was carrying a cloth briefcase over his shoulder, with a small plastic bag and a large white jawbreaker candy in his hands. As the temperature was approximately six degrees Fahrenheit, two coats were not inappropriate for the weather. Defendant was staring blankly into the air, was walking in a meandering, unsteady fashion, and did not appear to notice the Officers' presence.

The Officers, who were both wearing police uniforms, exited their vehicle and approached Defendant. Lt. Gavito greeted Defendant, asking him if he was all right and what he was doing in the area. Defendant did not respond, but did turn to look at Lt. Gavito, appearing to acknowledge his presence for the first time. Lt. Gavito told Defendant to drop the items in his hands, which he did. Lt. Gavito identified himself as a police officer and asked Defendant again what he was doing in the area. Defendant responded by mumbling incoherently. Lt. Gavito asked Defendant if he had any weapons, and not receiving an answer, proceeded to conduct a patdown search of Defendant's outer clothing. Lt. Gavito felt what he believed to be the butt of a handgun under Defendant's coat, and upon lifting the coat, Lt. Gavito saw and seized a pistol from Defendant's right front waistband. The Officers then handcuffed Defendant, placed him in their vehicle, and drove him to the Stock Show security office. While in the vehicle, Lt. Gavito asked Defendant for his name, which Defendant provided.

Once in the security office, the Officers asked Defendant for his birthdate and used Defendant's identifying information to access the records of his criminal history, at which point they discovered that Defendant had a prior felony conviction that prohibited him from possessing a firearm. During the time Defendant was detained in the security office, while the Officers were processing paperwork for Defendant's arrest, Defendant made statements requesting that the Officers return his gun to him. Defendant was subsequently transported to the Denver Detention Center, but was not immediately interviewed due to his apparent intoxication.

The following day, January 14, 2013, a number of law enforcement officers, including David Gallegos, an officer of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), met with Defendant in an interview room at the Denver Detention Center. Gallegos identified himself to

Defendant, presented a form to Defendant entitled "Advice of Rights and Waiver," and began to read Defendant his *Miranda* warnings. Defendant interrupted Gallegos and recited the first part of the warnings, and then picked up the waiver form and signed it. Gallegos took the waiver form back and informed Defendant that although the form was already signed, he wanted to read to Defendant the statement of his rights in full. Gallegos then read each line of the statement, asking Defendant after each line whether he understood. Defendant assented either verbally or with a nod of his head to each line of the statement, and Gallegos marked an "X" next to each line as he read it. Gallegos signed and dated the form as a witness. Defendant then proceeded to make several statements to Gallegos and the other officers, including discussing his prior felony conviction and his possession of the pistol.

## II. LEGAL STANDARD

The Fourth Amendment to the U.S. Constitution provides, in relevant part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." However, "[t]he Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a prudential doctrine created by th[e Supreme] Court to compel respect for the constitutional guaranty." *Davis v. United States,* — U.S. —, —, 131 S.Ct. 2419, 2426, 180 L.Ed.2d 285 (2011) (internal citations and quotation marks omitted). Pursuant to the exclusionary rule, a defendant may move for suppression of evidence obtained in violation of the Fourth Amendment. *Id.*

■ It is undisputed that the Officers did not have a warrant when they initially stopped Defendant or when they conducted the pat-down search. On a motion to suppress evidence obtained during a warrantless search or seizure, the Government bears the burden of proving the reasonableness of the search or seizure. *See, e.g., United States v. Maestas,* 2 F.3d 1485, 1491 (10th Cir.1993) ("As a general matter, if the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution.... [Thus,] when the defendant challenges a warrantless search or seizure the government carries the burden of justifying the agents' actions.") (internal quotations omitted); *see also United States v. Herrera,* 444 F.3d 1238, 1242 (10th Cir.2006); *United States v. Bute,* 43 F.3d 531, 534 (10th Cir.1994); *United States v. Finefrock,* 668 F.2d 1168, 1170 (10th Cir.1982).

■ Similarly, where a violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), is alleged, once a defendant presents evidence or allegations sufficient to support a motion to suppress, "the Government must then carry the countervailing burden of proving a waiver of the constitutional privilege against self-incrimination." *United States v. Crocker,* 510 F.2d 1129, 1135 (10th Cir. 1975) (abrogated on other grounds by *United States v. Bustillos–Munoz,* 235 F.3d 505 (10th Cir.2000)); *United States v. Fountain,* 776 F.2d 878, 886 (10th Cir. 1985); *Bond v. United States,* 397 F.2d 162, 165 (10th Cir.1968).

## III. ANALYSIS

Defendant argues first for the suppression of the pistol on the grounds that the Officers lacked reasonable articulable sus-

picion to stop and frisk Defendant,[1] and second for the suppression of Defendant's statements on the grounds that they were obtained in violation of *Miranda*. (ECF No. 13 at 3–8.) The Court will review each argument in turn.

## A. Stop and Frisk

■ Stop and frisk cases are governed by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny. Under *Terry*, "a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further." *Hiibel v. Sixth Judicial Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 185, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004). Reasonable suspicion is an objective standard, and "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981) ("[A]n assessment of the whole picture ... must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.").

■ Although reasonable suspicion requires "something more than an inchoate and unparticularized suspicion or hunch, the level of suspicion required ... is considerably less than proof by a preponderance of the evidence or that required for probable cause." *United States v. McHugh*, 639 F.3d 1250, 1255–56 (10th Cir.2011) (quotations and brackets omitted). In evaluating whether reasonable suspicion exists, deference is granted to an officer's ability to make inferences and deductions given his training, experience, and the "totality of the circumstances," and public interest considerations such as law enforcement officer safety are taken into account. *United States v. Rice*, 483 F.3d 1079, 1083 (10th Cir.2007).

■ Where an officer conducting a *Terry* stop has a reasonable suspicion that the suspect may be armed and dangerous, a limited search for concealed weapons—a pat-down search or frisk—may be conducted. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) (quoting *Terry*, 392 U.S. at 24, 88 S.Ct. 1868). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence.... So long as the officer is entitled to make a forcible stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapons search limited in scope to this protective purpose." *Id.*; *Hiibel*, 542 U.S. at 185, 124 S.Ct. 2451 ("The officer's action must be justified at its inception, and reasonably related in scope to the circumstances which justified the interference in

---

1. Defendant's Motion also argues that if the stop and frisk is construed as an arrest rather than a *Terry* stop, the pistol should be suppressed because the Officers lacked probable cause to arrest Defendant. (ECF No. 13 at 3–4.) At the hearing, Lt. Gavito's uncontradicted testimony indicated that Defendant was first stopped and frisked, the pistol was found, and then Defendant was arrested based upon probable cause to believe he had committed the crime of possession of a firearm while intoxicated under Colo.Rev.Stat. § 18–12–106(d). Although Defendant's counsel did not concede the existence of probable cause for the arrest, he did not contest when the arrest occurred in the course of events. Because both parties appear to agree that the arrest occurred *after* the frisk, it is undisputed that the arrest was not the frisk's legal justification. Thus, for the purposes of Defendant's Motion regarding the pistol, the Court need not decide the question of probable cause for the arrest, and will instead evaluate whether the frisk was justified as incident to a *Terry* stop.

the first place.") (internal quotation marks omitted); *Rice,* 483 F.3d at 1083 ("Officer safety is the primary objective justifying an officer's right to perform a pat-down search."). Thus, an officer conducting a pat-down search during a *Terry* stop must have reasonable suspicion justifying the initial stop, as well as reasonable suspicion justifying the pat-down. *See Rice,* 483 F.3d at 1082–83.

Defendant does not argue in his Motion, nor did he argue at the hearing, that there was no reasonable suspicion to briefly detain Defendant in the initial *Terry* stop. Rather, Defendant argues that no reasonable suspicion existed for the pat-down search, and that the pistol must therefore be suppressed as the fruit of a search that violated the Fourth Amendment. (ECF No. 13 at 4–6.) In response, the Government argues that Lt. Gavito's pat-down search was justified both by a suspicion that Defendant was armed and dangerous, and by Lt. Gavito's stated intent to take Defendant into protective custody due to his intoxication. (*See* ECF No. 17 at 7–8.)

### 1. *Armed and Dangerous*

In the Government's Response to the Motion, it argues that Defendant's apparent intoxication and presence in a high crime area supported the Officers' reasonable suspicion that Defendant was armed and dangerous, which justifies a pat-down search under *Terry.* (ECF No. 17 at 7–8.)

"In determining whether reasonable suspicion exists, we must look to the totality of the circumstances, rather than assessing each factor or piece of evidence in isolation, and no one factor is determinative." *United States v. McGehee,* 672 F.3d 860, 867 (10th Cir.2012) (citations and quotation marks omitted). Thus, while courts applying *Terry* have established that presence in a high crime area is a factor that tends to weigh in favor of a finding of

reasonable suspicion, "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979)). Because the suspicion must be "particularized" to a specific suspect in order to be reasonable, general contextual features of the environment surrounding the suspect, without more, are insufficient to meet the objective standard. *See id.*

Nevertheless, an area's high crime rate is a factor that can contribute to a finding of reasonable suspicion, particularly where accompanied with a suspect's nervous or evasive behavior. *See, e.g., Wardlow,* 528 U.S. at 124, 120 S.Ct. 673 (suspect's unprovoked attempt to flee police in high crime area sufficient for reasonable suspicion to detain suspect); *United States v. Brignoni–Ponce,* 422 U.S. 873, 885, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (suspect's evasive behavior or attempts to duck and hide while passing through a border traffic stop sufficient for reasonable suspicion to detain suspects); *Adams,* 407 U.S. at 147, 92 S.Ct. 1921 (suspect sitting alone in parked car in high crime area at 2:15 a.m., rolling down window rather than stepping out of car as officer requested, and informant's tip that a person in that location was carrying narcotics and a concealed weapon was sufficient for reasonable suspicion to detain and search for weapons).

A suspect's intoxication may also contribute to a finding of reasonable suspicion; however, courts treat intoxication as indicative of criminal activity only where intoxication is an element of the suspected crime, or where it is accompanied by other factors that jointly establish reasonable

suspicion.[2] *See United States v. Neff,* 300 F.3d 1217, 1219 (10th Cir.2002) (reasonable suspicion where officers received a report of an apparently intoxicated man behaving oddly and carrying a gun in a high crime area at 1:40 a.m.); *Gallegos v. City of Colorado Springs,* 114 F.3d 1024, 1029 (10th Cir.1997) (reasonable suspicion where two neighbors reported a "prowler" at 1:00 a.m. "messing with the fence," running down the street, apparently drunk and arguing loudly, and officers observed him crying, talking to himself and smelling of alcohol).

■ In the instant case, the information the Officers possessed about Defendant did not indicate that he was armed and dangerous. The Officers both testified that the dispatcher gave them only a brief physical description, location, and the conclusory statement that the suspect was "suspicious" and disoriented. The Officers spoke only briefly to Garcia, the security guard, and Gomez, the parking attendant, both of whom merely pointed out Defendant's whereabouts and stated that he appeared intoxicated.[3] Although all of the third-party reports the Officers received included an indication that Defendant was disoriented or intoxicated, none of these reports contained any information suggesting that Defendant was armed and dangerous.

Nor did the Officers' own observations and knowledge about Defendant lead to a reasonable suspicion that he was armed and dangerous. Lt. Gavito testified that the "number one" reason he conducted a pat-down search was his intention to place Defendant in protective custody due to his intoxication, and the "number two" reason was the high crime frequency at the Stock Show and the neighborhood where it was situated. Lt. Gavito explained that in addition to several vehicle break-ins that had occurred in neighboring Stock Show parking lots, the part of town where the Stock Show takes place is host to a concentrated gang population, whose members are frequently armed. Further, Lt. Gavito stated that in many years of working as an officer at the Stock Show, he has had numerous encounters with unauthorized weapons possession.

Lt. Gavito did not state any particularized facts that would lead a reasonable officer to believe that Defendant was a gang member, that he suspected Defendant had been breaking into vehicles, or that a suspect breaking into vehicles would be armed and dangerous. Even assuming that the location where Defendant was found constitutes a high crime area, his

---

**2.** The Government's Response cites *United States v. Blackmon,* 662 F.3d 981 (8th Cir. 2011), as support for the proposition that "an individual's errant or intoxicated behavior in a public or high-crime area" is sufficient to establish reasonable suspicion. (ECF No. 17 at 5–6.) However, the suspect in *Blackmon* was not merely intoxicated in a high crime area; he was also believed to have violated a protective order. 662 F.3d at 985. Therefore, contrary to the Government's implication, *Blackmon* did not establish that intoxication in a high crime area, without more, suffices to establish reasonable suspicion. The Government also cites *United States v. Brown,* 232 F.3d 589 (7th Cir.2000) for the holding that a pat-down was justified where

an intoxicated suspect was acting "erratically." However, as with *Blackmon,* the Government mischaracterizes the facts of *Brown.* The suspect in *Brown* was driving a vehicle while intoxicated, and had been involved in two hit and run accidents displaying belligerent and aggressive—not merely erratic—behavior. *Id.* at 593–95.

**3.** Morris also noticed a bulge under Defendant's coat, but did not report it to the Officers or to any other person, and no other witness noticed a bulge; therefore, it was not considered by the Officers whose actions are challenged here, and is not relevant to the Court's analysis.

presence in a high crime area, standing alone, is insufficient to establish reasonable suspicion. *See Brown,* 443 U.S. at 52, 99 S.Ct. 2637.

In fact, the only particularized features of Lt. Gavito's testimony regarding the justification for the pat-down search involved Defendant's apparent intoxication, first regarding taking Defendant into protective custody, and second regarding Lt. Gavito's experience that intoxicated individuals can be aggressive and hostile. The Officers' testimony gave no indication that Defendant showed any particularized signs of aggressiveness or hostility. Additionally, the evidence at the hearing indicated that none of the parking attendants or security staff who encountered Defendant reported concern for any danger posed by Defendant beyond his intoxication and lack of responsiveness. Without more, evidence of intoxication is insufficient to provide reasonable suspicion justifying a pat-down weapons search. *Cf. Gallegos,* 114 F.3d at 1029.

In sum, the Court finds no evidence supporting a reasonable, particularized suspicion that Defendant was armed and dangerous. Therefore, the pat-down of Defendant was not justified by such a suspicion.

### 2. *Protective Custody*

■ Although the Government did not raise the argument in its Response, at the hearing the Government argued that the pat-down search was justified by an alternative rationale. The Government contends that the Officers were permitted to frisk Defendant because they believed they needed to take Defendant into protective custody under Colorado's Emergency Commitment statute, which reads as follows:

> When a person is intoxicated or incapacitated by alcohol and **clearly dangerous to the health and safety of himself, herself, or others,** he or she shall be taken into protective custody by law enforcement authorities or an emergency service patrol, **acting with probable cause,** and placed in an approved treatment facility. . . .
>
> A law enforcement officer or emergency service patrol officer, in detaining the person, is taking him or her into protective custody. In so doing, **the detaining officer may protect himself or herself by reasonable methods** but shall make every reasonable effort to protect the detainee's health and safety.

Colo.Rev.Stat. § 27–81–111 (emphasis added).

The Colorado Supreme Court has held that a pat-down search pursuant to the Emergency Commitment statute is constitutionally permissible, because "one factor to be considered in balancing a detainee's privacy interest against legitimate governmental needs to interfere with that interest is the safety of the officer as well as the detainee during such transportation [to a detox center]." *People v. Dandrea,* 736 P.2d 1211, 1218 (Colo.1987). While recognizing that such a determination must be made on a case-by-case basis, the *Dandrea* Court held that "in most cases involving detention of a private citizen for the sole purpose of placing that person in civil protective custody, a pat-down search for weapons at the scene would fully satisfy the need to assure officer safety and the safety of the individual." *Id.*

The Tenth Circuit has not explicitly found a pat-down pursuant to Colorado's Emergency Commitment to be an exception to the warrant requirement for a search. However, the Tenth Circuit has approved the Emergency Commitment statute's articulation of the standard that "to justify seizure for intoxication by alcohol, an officer must have probable cause to

believe an intoxicated person is a danger to himself or others," holding that in including this requirement, "the Fourth Amendment standard is reflected in the state civil commitment statute." *Anaya v. Crossroads Managed Care Sys., Inc.*, 195 F.3d 584, 591, 591 n. 2 (10th Cir.1999). As noted in *Anaya*, such warrantless seizures are permitted in similar state statutes, as the state has an interest in "protecting the public from the intoxicated and the intoxicated from themselves." *Id.* (citing *Powell v. Texas*, 392 U.S. 514, 554 n. 5, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (White, J. concurring) (it is within the "power of the State to remove a helplessly intoxicated person from a public street, although against his will, and to hold him until he has regained his powers")); *see also United States v. Rideau*, 969 F.2d 1572, 1574 (5th Cir.1992).

Furthermore, the Tenth Circuit has held that a non-investigatory seizure of an intoxicated individual is justified under police officers' "community caretaking functions," even without specific reference to an Emergency Commitment statute. *See United States v. King*, 990 F.2d 1552, 1560 (10th Cir.1993) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), and collecting cases).[4] In exercising this community caretaking function, an officer may detain an individual "in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.... The fact that the officer may not suspect the individual of criminal activity does not render such a seizure unreasonable *per se* as *Terry* only requires 'specific and articula-

ble facts which ... reasonably warrant [an] intrusion' into the individual's liberty." *Gallegos*, 114 F.3d at 1029.

■ Indeed, although "some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure[,] ... the Fourth Amendment imposes no irreducible requirement of such suspicion." *United States v. Martinez–Fuerte*, 428 U.S. 543, 560–61, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976). Instead, "[t]he touchstone of the Fourth Amendment is reasonableness, not individualized suspicion." *Samson v. California*, 547 U.S. 843, 855 n. 4, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). In other words, a *Terry* stop is not the only permissible reason for a warrantless seizure and limited weapons search. *See Whren v. United States*, 517 U.S. 806, 811–12, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (noting that the Fourth Amendment is not offended by reasonable inventory searches or administrative inspections, neither of which requires a warrant or probable cause).

■ As with a pat-down search pursuant to a *Terry* stop where criminal activity is suspected, a pat-down search under Colorado's Emergency Commitment statute is justified by a reasonable concern for police officer safety as balanced against a limited intrusion of an individual's expectation of privacy. *See Adams*, 407 U.S. at 146, 92 S.Ct. 1921; Colo.Rev.Stat. § 27–81–111. This reasoning further accords with Tenth Circuit precedent establishing a community caretaking exception to the warrant requirement that applies in cases of intoxicated individuals. *See Garner*, 416 F.3d at

---

4. In *United States v. Garner*, 416 F.3d 1208 (10th Cir.2005), the Tenth·Circuit confronted a line of cases that placed the community caretaking exception in question when applied outside an automobile search context. *See* 416 F.3d at 1213–14. In distinguishing those cases, *Garner* held that the community

caretaking exception applies to circumstances involving, "as here, the brief detention of a citizen reasonably believed by the officers to be at risk to himself." *Id.* at 1214. Accordingly, *King* "remains the law of this circuit," and applies in the instant analogous case. *See id.*

1213–14. Therefore, the Court must determine whether the pat-down search was appropriately conducted pursuant to the Emergency Commitment statute in the instant case.

In order to take an individual into protective custody under the Emergency Commitment statute, an officer must have probable cause to believe that a person is sufficiently intoxicated as to be a danger to himself or others, given the totality of the circumstances. *Dandrea*, 736 P.2d at 1218. Probable cause is established where "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing" the requisite elements. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) (describing probable cause for an arrest). Colorado courts have interpreted this standard to mean that a police officer making an initial stop of an intoxicated individual "must *reasonably suspect* that civil protective custody may be warranted. Once police officers make initial contact with such an individual, they must ascertain whether probable cause exists under [the Emergency Commitment statute] to place the individual in civil protective custody for transport elsewhere." *People v. Herrera*, 1 P.3d 234, 238 (Colo. Ct.App.1999) (emphasis added). Thus, like a *Terry* stop, the initial encounter—unlike the actual imposition of protective custody—need not be justified by probable cause, but only by reasonable suspicion. *See Gallegos*, 114 F.3d at 1029 n. 4; *Rideau*, 969 F.2d at 1574. While the federal courts discussing similar cases have not squarely confronted the question of a frisk conducted prior to protective custody, the cases' approval of an extension of the reasonable suspicion standard to the protective custody context when justifying an initial stop suggests that a similar extension is appropriate for a frisk.

However, even if probable cause is required to conduct a pat-down search pursuant to Emergency Commitment, the Court finds that evidence supporting probable cause for civil commitment existed here. Even without extensive observation of the Defendant, Lt. Gavito testified at the hearing that Defendant was "definitely" under the influence of alcohol or drugs, and Defendant's intoxication and disorientation had been reported by additional reliable parties such as Garcia, the security guard. Although Defendant's presence in a high crime area is insufficient to find reasonable suspicion that he was armed and dangerous, it nevertheless contributes to a reasonable finding that Defendant's level of intoxication in such an area placed him at potential risk. Defendant's lack of responsiveness to Lt. Gavito's questions, and apparent difficulty even in recognizing the Officers' presence until Lt. Gavito spoke to him, supports a reasonable finding that Defendant's reaction time and powers of observation were severely impaired. Given that Defendant had been wandering alone in six-degree weather in an area where large livestock were kept, crossing roads and parking lots where vehicles traveled frequently, and was so impaired that he appeared to be incapable of recognizing his environment or walking straight, a "prudent man" in the Officers' position could have believed that in Defendant's condition, he posed at least a clear danger to himself, if not to others. *See Beck*, 379 U.S. at 91, 85 S.Ct. 223. The Court therefore finds that Lt. Gavito had probable cause to initiate the process of taking Defendant into protective custody.

Thus, although Lt. Gavito's pat-down search was not justified by reasonable suspicion that Defendant was armed and dangerous, it was reasonable for Lt. Gavito to frisk Defendant for weapons in preparing to take Defendant into protective custody

under Colorado's Emergency Commitment statute. Accordingly, the Court finds that the limited pat-down search in the instant case did not violate the Fourth Amendment, and the pistol need not be suppressed.

## B. *Miranda*

 Defendant's final argument requests the suppression of his inculpatory statements. Under *Miranda*, a suspect's statements are generally inadmissible as violative of the Fifth Amendment if law enforcement officers elicited them during a custodial interrogation without giving the prescribed warnings and obtaining a waiver. *Miranda*, 384 U.S. at 444, 478–79, 86 S.Ct. 1602. Police must advise suspects of their *Miranda* rights prior to custodial interrogation for a suspect's subsequent statements to be admissible against him. *Id.* at 467–68, 86 S.Ct. 1602. However, *Miranda* does not bar the admission of voluntary statements made outside the context of a custodial interrogation, nor does it bar the admission of statements made after a valid waiver of the suspect's *Miranda* rights. *Id.* at 444, 86 S.Ct. 1602; *see also Pickens v. Gibson*, 206 F.3d 988, 994–95 (10th Cir.2000).

Defendant's Motion argues only that his statements made prior to being read the *Miranda* warnings should be suppressed. (ECF No. 13 at 7.) However, during the hearing, Defendant's counsel also argued for the suppression of Defendant's statements made after the *Miranda* warnings, claiming that Defendant's waiver was not knowing, intelligent, and voluntary. The Government's Response argues that Defendant's statements prior to his *Miranda* warnings are admissible as spontaneous and voluntary rather than the product of an interrogation, and that Defendant's waiver was valid and voluntary. (ECF

No. 17 at 8–10.) The Court will address each *Miranda* argument in turn below.

### 1. *Pre–Miranda Statements: Custodial Interrogation*

 "It is well established that police officers are not required to administer *Miranda* warnings to everyone whom they question. Instead, *Miranda* only applies when an individual is subject to custodial interrogation." *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir.2000) (quotation marks and citations omitted). "Thus two requirements must be met before *Miranda* is applicable; the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir.1993). "'[I]nterrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). This definition focuses on the coercive effect of the officers' words or actions on the suspect. *Id.*

 Defendant argues that his pre-*Miranda* statements were made during a custodial interrogation, and therefore are not admissible. (ECF No. 13 at 7.) It is undisputed that Defendant, who was handcuffed in the Stock Show security office, was in custody when the statements at issue were made. (*See* ECF No. 17 at 8.) Thus, the relevant question is whether Defendant was subject to interrogation such that his pre-*Miranda* statements were elicited or coerced by the Officers.

None of the evidence in the record permits a finding that Defendant was subject to interrogation when he made his initial

incriminating statements. The Officers asked Defendant for his name and birthdate, but there is no evidence that the Officers asked Defendant any other questions, made any other statements or took any other actions that would have been likely to be coercive. Rather, the testimony at the hearing showed that the Officers did not make any attempt to interact with Defendant due to his intoxication, that Defendant faded in and out of consciousness, and that Defendant's statements requesting to have his gun back were completely spontaneous, prompted only by the seizure of the pistol. The Officers' testimony in this regard was uncontradicted and unimpeached. The Court finds no evidence that Defendant was subject to an interrogation or its functional equivalent, and thus Defendant's statements made while detained in the security office need not be suppressed.

### 2. *Post–Miranda Statements: Waiver*

■ Statements made after *Miranda* warnings are given are admissible where the defendant "knowingly and voluntarily" waived his *Miranda* rights before making the statements. *N. Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). "The waiver inquiry has two distinct dimensions: waiver must be voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception, and made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)) (internal quotation marks omitted).

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver." *Butler*, 441 U.S. at 373, 99 S.Ct. 1755. However, such a statement "is not inevitably either necessary or sufficient to establish waiver." *Id.* Instead, "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation"—must be considered, including the suspect's age, education, intelligence, length of detention or of questioning that may have led to the waiver, and the use of physical or psychological abuse leading to the waiver, in order to determine whether the suspect knowingly and voluntarily waived his *Miranda* rights. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Chalan*, 812 F.2d 1302, 1307 (10th Cir. 1987) (citing *Bustamonte*).

■ Here, Defendant signed an Advice of Rights and Waiver form waiving his *Miranda* rights before making statements. No evidence was introduced to demonstrate that Defendant's age, education, intelligence, or a coercive feature of the surrounding interrogation should have had an impact on a finding that the waiver was not voluntary. Rather, Defendant's counsel argued at the hearing that because Defendant signed the waiver form prior to being given the full *Miranda* warnings, and because a recording of the interview showed that Defendant did not assent verbally to each line of the warnings, that it was not apparent that Defendant's waiver was knowing, intelligent and voluntary.

The Court finds the evidence present in the instant case insufficient to counter the general presumption that a signed written waiver is "strong proof" of that waiver's validity. *See Butler*, 441 U.S. at 373, 99 S.Ct. 1755. While the recording of the interview confirms that Defendant did sign the waiver prior to being read his

full *Miranda* warnings, it also indicates that Defendant was read each warning subsequent to signing the waiver, and prior to making any statements. Accepting as voluntary a waiver signed prior to the reading of the *Miranda* warnings, where Defendant's signature was immediately followed by a complete reading of those warnings and an accompanying statement or gesture of assent to each, is not "the kind of trickery that can vitiate the validity of a waiver." *Burbine,* 475 U.S. at 423, 106 S.Ct. 1135 (citing *Miranda,* 384 U.S. at 476, 86 S.Ct. 1602) (internal quotation marks omitted).

Further, as cited in the Government's Response, the case law indicates that a suspect's prior criminal history and concomitant familiarity with the *Miranda* warnings support a finding that a waiver was knowing and intelligent—applicable here not only because of Defendant's prior criminal history, but also because Defendant recited half of the *Miranda* warnings from memory before signing the waiver. *See United States v. Morris,* 247 F.3d 1080, 1090 (10th Cir.2001) (valid waiver by 19–year–old with 10th grade education in part because of 5 prior arrests); *Alston v. Redman,* 34 F.3d 1237, 1254 (3d Cir.1994) (confession voluntary in part due to defendant's prior experience with the criminal justice system); *United States v. Hall,* 724 F.2d 1055, 1059 (2d Cir.1983) (valid waiver where defendant was "no newcomer to the jurisprudence of *Miranda*" due to a prior conviction whose appeal turned on a *Miranda* question).

Accordingly, the Court finds that Defendant's waiver of his *Miranda* rights, as demonstrated by the evidence adduced at the hearing and the waiver form bearing his signature, was knowing and voluntary, and therefore his incriminating statements need not be suppressed.

## IV. CONCLUSION

In accordance with the foregoing, the Court hereby ORDERS as follows:

(1) Defendant's Motion to Suppress (ECF No. 13) is DENIED; and

(2) All deadlines and a trial date will be re-set via separate order of the Court.